HOFFMAN PLASTIC COMPOUNDS,
INC., Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 98–1570.

United States Court of Appeals,
District of Columbia Circuit.

Argued *En Banc* Sept. 27, 2000.

Decided Jan. 16, 2001.

Maurice Baskin argued the cause for petitioner. With him on the briefs was Ryan D. McCortney.

Sharon Block, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were Leonard R. Page, General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Fred L. Cornnell, Jr., Attorney. Linda R. Sher, Associate General Counsel, and John D. Burgoyne, Deputy Associate General Counsel, entered appearances.

James B. Coppess argued the cause for amicus curiae American Federation of Labor and Congress of Industrial Organizations. With him on the brief were Jonathan P. Hiatt and Laurence Gold.

Before: EDWARDS, Chief Judge, WILLIAMS, GINSBURG, SENTELLE, HENDERSON, RANDOLPH, ROGERS, TATEL, GARLAND, Circuit Judges, and SILBERMAN, Senior Circuit Judge.*

Opinion for the Court filed by Circuit Judge TATEL.

* Senior Judge Silberman was in regular active service at the time of oral argument. Judge

Dissenting opinion filed by Circuit Judge SENTELLE, in which Circuit Judges GINSBURG, HENDERSON, and RANDOLPH join.

Dissenting opinion filed by Circuit Judge GINSBURG.

TATEL, Circuit Judge:

Petitioner illegally fired several workers in retaliation for their attempts to organize a union. Finding multiple unfair labor practices, the National Labor Relations Board ordered its traditional remedy, reinstatement with backpay, for all discharged employees. When the Board learned that one discriminatee was an undocumented alien, it denied reinstatement and terminated backpay as of the date petitioner discovered the discriminatee's lack of documentation. Challenging even this reduced award, petitioner argues that both *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 104 S.Ct. 2803, 81 L.Ed.2d 732 (1984), and the Immigration Reform and Control Act of 1986 ("IRCA"), 100 Stat. 3359, bar awards of any backpay to undocumented discriminatees. We disagree. Properly understood, *Sure-Tan* supports backpay awards to undocumented discriminatees so long as the awards reflect the discriminatees' actual losses. Moreover, because nothing in IRCA prohibits such limited backpay awards, and because the Board fashioned the award in this case not just to fulfill the objectives of the National Labor Relations Act, but also to avoid violations of IRCA, the award falls within the Board's broad remedial discretion. We therefore deny the petition for review and grant the cross-application for enforcement.

I

Petitioner Hoffman Plastic Compounds, Inc., manufactures custom-formulated polyvinylchloride pellets for use by customers who produce pharmaceutical, construction, and household products. In May

Garland took no part in this matter.

1998, José Castro began working in Hoffman's production plant earning minimum wage as a compounder, an operator of large blending machines that mix and cook plastic formulas ordered by customers. When the United Rubber, Cork, Linoleum, and Plastic Workers of America, AFL–CIO began an organizing drive at Hoffman's factory, Castro, along with several other employees, distributed union authorization cards to coworkers. Following what the Board later described as "coercive and restraining" interrogation of union supporters, Hoffman laid off all employees who had engaged in organizing activities, including Castro. *Hoffman Plastic Compounds, Inc.*, 306 N.L.R.B. 100, 1992 WL 14561 (1992).

After one discharged employee filed charges with the Board, an Administrative Law Judge found that the company had engaged in multiple unfair labor practices. The Board adopted the ALJ's findings, concluding not only that Hoffman had unlawfully interrogated employees about their union activities and sympathies, but also that "in order to rid itself of known union supporters, [the company] discriminatorily selected union adherents for layoff" in violation of sections 8(a)(1) and (3) of the NLRA, 29 U.S.C. § 158(a)(1), (3). *Hoffman Plastic*, 306 N.L.R.B. at 100. The Board ordered Hoffman to cease and desist from such unfair labor practices, to post a notice at the work site, and to reinstate and make whole the union supporters it had illegally fired.

When a dispute arose as to the proper computation of backpay, a compliance hearing was held before another ALJ. Castro appeared at the hearing, testifying through an interpreter. When Hoffman's attorney began questioning Castro about his citizenship, the Board's General Counsel objected. The ALJ sustained the objection, but not before Castro had stated that he was a Mexican national and that the birth certificate he had used to gain employment at Hoffman was borrowed from a friend. On the basis of this admis-

sion, the ALJ recommended neither reinstatement nor backpay. In reaching this conclusion, the ALJ relied on IRCA, which makes it unlawful for employers to knowingly hire undocumented workers and for employees to use fraudulent documents to establish employment eligibility. *See Hoffman Plastic Compounds, Inc.*, 314 N.L.R.B. 683, 685, 1994 WL 397901 (1994).

Expressly considering the policies of both IRCA and the NLRA, the Board agreed with the ALJ that reinstatement of an undocumented discriminatee would be inappropriate. *See* 326 N.L.R.B. No. 86, 1998 WL 663933, at *2–4 (Sept. 23, 1998). As the Board had explained in an earlier case, ordering reinstatement would force an employer to violate IRCA's prohibition against knowingly hiring undocumented aliens. *See A.P.R.A. Fuel Oil Buyers Group, Inc.*, 320 N.L.R.B. 408, 415, 1995 WL 803434 (1995). The Board disagreed with the ALJ that IRCA prevented any award of backpay. To account for IRCA's prohibition on the fraudulent use of documents, however, the Board applied its well-established after-acquired evidence rule and ended backpay liability the moment Hoffman became aware of Castro's undocumented status. *Hoffman Plastic*, 1998 WL 663933 at *3–4.

Hoffman petitioned for review of the Board's order. The company did not challenge the Board's finding that it committed unfair labor practices, including the illegal discharge of known union organizers. It contested only Castro's limited backpay award, arguing primarily that awards of backpay to undocumented discriminatees are barred by *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 104 S.Ct. 2803, 81 L.Ed.2d 732, and, in the alternative, by IRCA. Cross-applying for enforcement, the NLRB, supported by amicus AFL–CIO, responded that the limited backpay award runs afoul of neither *Sure-Tan* nor IRCA and falls well within the Board's remedial discretion.

A divided panel of this court resolved all issues in the Board's favor. *Hoffman*

*Plastic Compounds, Inc. v. NLRB,* 208 F.3d 229 (D.C.Cir.2000). We then granted Hoffman's petition for rehearing *en banc* and vacated the panel opinion. Having now heard Hoffman's claims *en banc,* we again deny the petition for review and grant the Board's cross-application for enforcement.

## II

■■■ We begin with Hoffman's argument, embraced by our dissenting colleagues, that this case is controlled by a single sentence from *Sure-Tan:* "[I]n computing backpay, the employees must be deemed 'unavailable' for work (and the accrual of backpay therefore tolled) during any period when they were not lawfully entitled to be present and employed in the United States." *Sure-Tan,* 467 U.S. at 903, 104 S.Ct. 2803. This sentence, Hoffman claims, "plainly prohibits" the NLRB from awarding even limited backpay to undocumented workers victimized by unfair labor practices. Read literally and divorced from *Sure-Tan's* factual and legal context, the sentence could well be interpreted to support that view. But the Supreme Court has warned against "dissect[ing] the sentences of the United States Reports as though they were the United States Code." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). And as we have said, "[t]he Court's every word and sentence cannot be read in a vacuum; its pronouncements must be read in light of the holding of the case and to the degree possible, so as to be consistent with the Court's apparent intentions and with other language in the same opinion." *Aka v. Washington Hosp. Ctr.,* 156 F.3d 1284, 1291 (D.C.Cir.1998) (*en banc*).

Read in context, the *Sure-Tan* sentence does not bar backpay to undocumented discriminatees. The Seventh Circuit originally crafted the sentence, which the Supreme Court merely repeated, to deal with unique circumstances of *Sure-Tan* not present in this case. Contested by neither party, the restriction imposed by the sentence did not address an issue in dispute before the Court; nor did it play any part in either *Sure-Tan's* holding or reasoning. As such, the sentence is hardly "considered ... dict[um]." *Cf.* Dissenting Op. at 654. Moreover, extending the sentence beyond the facts of *Sure-Tan,* as Hoffman urges, would conflict with the Court's holding that an undocumented discriminatee is entitled to backpay so long as it is appropriately tailored to the discriminatee's actual loss.

The employer in *Sure-Tan* committed an unfair labor practice when, in retaliation for its employees' success in electing a union, it alerted the Immigration and Naturalization Service that some of its employees might be undocumented. Rather than deport the workers, the INS allowed them to leave the country voluntarily. "By the end of the day, all five employees were on a bus ultimately bound for Mexico." *Sure-Tan,* 467 U.S. at 887, 104 S.Ct. 2803. The Board ordered the traditional remedy of reinstatement with backpay. *Sure-Tan,* 246 N.L.R.B. 788, 1979 WL 9533 (1979). Two members dissented, fearing that these remedies could produce violations of the then-existing immigration law, the Immigration and Nationality Act. *Id.* at 789–90. The INA focused not on employment of undocumented workers—that came later when Congress enacted IRCA—but rather on "the terms and conditions of admission to the country." *Sure-Tan,* 467 U.S. at 892, 104 S.Ct. 2803 (quoting *De Canas v. Bica,* 424 U.S. 351, 359, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976)). Citing these prohibitions, the dissenters would have limited the remedy to avoid "encourag[ing] a discriminatee to reenter the country illegally." *Sure-Tan,* 246 N.L.R.B. at 789.

Echoing the dissenting members' concerns, the Seventh Circuit "modif[ied the Board's] remedy in some aspects." *See NLRB v. Sure-Tan, Inc.,* 672 F.2d 592, 603–06 (7th Cir.1982). The court allowed Sure-Tan to remind the discriminatees in the reinstatement offer that without ob-

taining proper documentation they could not reenter the United States to reclaim their jobs. *Id.* at 605–606. To reduce the appeal of illegal reentry, the court also modified the order "to require reinstatement only if the discriminatees are legally present and legally free to be employed in this country when they offer themselves for reinstatement." *Id.* at 606.

Eliminating still another incentive for illegal reentry, the court added a clarification to the Board's backpay order, a clarification that forms the basis for the sentence at issue in this case: "[I]n computing backpay discriminatees will be deemed unavailable for work during any period when not lawfully entitled to be present and employed in the United States." *Id.* This limitation, which was based on the Board's standard practice of tolling backpay when discriminatees are physically unavailable, *see Local 512, Warehouse & Office Workers' Union v. NLRB*, 795 F.2d 705, 716 n. 9 (9th Cir.1986) ("*Felbro*") (citing 3 NLRB Casehandling Manual §§ 10,612, 10,656.9), including when out of the country, *see Hickory's Best, Inc.*, 267 N.L.R.B. 1274, 1277, 1983 WL 24897 (1983), ensured that illegal reentry would not restart the accumulation of backpay.

Though the Seventh Circuit believed that these restrictions were needed to prevent violations of the INA, it worried that "in the circumstances of this case"—the *Sure-Tan* discriminatees had been out of the country since the company's violation—the restrictions might result in no backpay at all. *See Sure-Tan*, 672 F.2d at 606. To solve this problem and to "effectuate the policies of the [NLRA]," the court ordered the employer to pay the discriminatees backpay for an "obviously conjectural" six-month period. *Id.*

The Supreme Court began by emphasizing that neither party challenged the "not lawfully entitled" restriction on which Hoffman now relies. Sure-Tan had supported the restriction throughout, *Sure-Tan*, 467 U.S. at 898 n. 8, 104 S.Ct. 2803, and even the Board had come to accept it:

Conditioning the offers of reinstatement on the employees' legal reentry and deeming the employees "unavailable" during any period when they were not lawfully present are requirements that were in fact imposed by the Court of Appeals in this case, and hence fully accepted by the Board.... The Board has clearly indicated its agreement with these portions of the Court of Appeals' remedial order by specifically noting that petitioners do not challenge these parts of the order [and] by limiting its own argument to the *minimum backpay award* issue alone.

*Id.* at 903 n. 12, 104 S.Ct. 2803 (emphasis added); *see also Del Rey Tortilleria, Inc. v. NLRB*, 976 F.2d 1115, 1123 (7th Cir. 1992) (Cudahy, J., dissenting). Turning its attention to that limited issue—the "minimum backpay award"—the Supreme Court held that the Seventh Circuit had not only "exceeded its narrow scope of review" by substituting its own judgment for that of the Board, but also erred by not sufficiently tailoring its remedy "to the actual, compensable injuries suffered by the discharged employees." *Sure-Tan*, 467 U.S. at 900, 901, 104 S.Ct. 2803. Although agreeing with the Seventh Circuit that these restrictions would mean that the Sure-Tan discriminatees would likely receive no backpay, *id.* at 903–04, 104 S.Ct. 2803, the Court cautioned that "the probable unavailability of the [NLRA's] more effective remedies in light of the practical workings of the immigration laws, however, simply cannot justify the judicial arrogation of remedial authority not fairly encompassed within the Act." *Id.* at 904, 104 S.Ct. 2803. In reaching this conclusion, the Court mentioned the "not lawfully entitled" restriction on backpay simply to explain the Seventh Circuit's motive for imposing a six-month minimum award. The additional sentence relied on by our dissenting colleagues, *see* Dissenting Op. at 651, adds no new restriction; it merely summarizes the Court's holding that backpay awards must be tailored to the discri-

minatees' individual circumstances as determined by the Board.

Not only does the sentence on which Hoffman relies thus form no part of *Sure-Tan*'s holding or reasoning, but contrary to the company's claim, it presents no bar to awarding backpay to undocumented discriminatees. As we explain above, the Seventh Circuit crafted the restriction to ensure that the *Sure-Tan* discriminatees who had left the country would not reenter illegally to claim backpay. *See supra* at 653–54. In so interpreting the restriction, we rely not on the Seventh Circuit's intended meaning, *cf.* Dissenting Op. at 652–53, but rather on the Supreme Court's expression of precisely the same concern:

> [A]s the Court of Appeals recognized, the implementation of the Board's traditional remedies at the compliance proceedings must be conditioned upon the employees' *legal readmittance to the United States*. In devising remedies for unfair labor practices, the Board is obliged to take into account another equally important Congressional objectiv[e]—to wit, the objective of *deterring unauthorized immigration* that is embodied in the INA. By conditioning the offers of reinstatement on the employees' *legal reentry,* a potential conflict with the INA is thus avoided. Similarly, in computing backpay, the employees must be deemed "unavailable" for work (and the accrual of backpay therefore tolled) during any period when they were not lawfully entitled to be present and employed in the United States.

*Id.* at 902–03, 104 S.Ct. 2803 (internal quotation marks and citation omitted) (emphasis added).

It is true, as Hoffman points out, that the words "not lawfully entitled to be present and employed" sweep more broadly than necessary to deter undocumented discriminatees from reentering the country illegally. But reading these words to impose an absolute bar to any award of backpay for undocumented discriminatees not only ignores the fact that the Seventh Circuit crafted the restriction to deal with the precise problem it faced—undocumented discriminatees returning to the country illegally to claim backpay—but also conflicts with "other language" (our words in *Aka,* 156 F.3d at 1291) making it clear that undocumented discriminatees are in fact entitled to backpay. Specifically, the Court "generally approve[d of] the Board's original course of action in this case by which it ordered the conventional remedy of reinstatement and backpay," leaving calculation of the precise amount of backpay until the compliance proceeding. *Sure-Tan,* 467 U.S. at 902, 104 S.Ct. 2803. The "main deficiency" in the Seventh Circuit's order, the Court explained, was not that it awarded backpay to undocumented discriminatees, but that the *amount* of backpay awarded was "develop[ed] in the total absence of any record evidence as to the circumstances of individual employees," thus violating the "cardinal" proposition "that a backpay remedy must be sufficiently tailored to expunge only the *actual,* and not merely *speculative,* consequences of the unfair labor practices." *Id.* at 899–900 n. 9, 900, 104 S.Ct. 2803. The Court continued:

> [T]he Court of Appeals "estimated" an appropriate period of backpay without any evidence whatsoever as to the period of time these particular employees might have continued working before apprehension by the INS and without affording petitioners any opportunity to provide mitigating evidence. In the absence of relevant factual information or adequate analysis, it is inappropriate for us to conclude ... that the Court of Appeals had estimated the proper minimum backpay award "with a fair degree of precision."

*Id.* at 901–02 n. 11, 104 S.Ct. 2803. If, as Hoffman argues, undocumented discriminatees may never be awarded backpay, the Court would not have mentioned "the proper minimum backpay award" or "the period of time these particular employees

might have continued working." Nor would there have been a need for more "relevant factual information or adequate analysis," much less for a compliance proceeding to determine the amount of backpay actually due. According to the dissent, the compliance proceeding was intended only to determine whether the discriminatees had legally returned to the country. *See* Dissenting Op. at 653–54. The Supreme Court itself made clear, however, that such a hearing would determine "the period of time these particular employees might have continued working before apprehension by the INS." *See Sure-Tan,* 467 U.S. at 902 n. 11, 104 S.Ct. 2803.

Hoffman next argues that IRCA's subsequent adoption of employer penalties for knowingly hiring undocumented aliens extended the *Sure-Tan* sentence to all undocumented discriminatees, including those who, like Castro, never leave the country. According to Hoffman, Castro now falls squarely within the *Sure-Tan* sentence because he is no longer "legally entitled to be ... employed." Had the sentence established a general rule of law, we might agree. As we demonstrate above, however, the sentence is neither general (it addressed only the unique factual situation in *Sure-Tan*), nor a rule (it played no part in either the Court's holding or reasoning). The Court, moreover, did not consistently describe the limitation in terms of employment eligibility. At one point, it referred to the sentence as conditioning backpay merely on "legal presence in this country"; elsewhere, it referred to being "lawfully present." *Id.* at 898 n. 8, 104 S.Ct. 2803; *id.* at 903 n. 12, 104 S.Ct. 2803.

Two of the three Circuits that have addressed this issue agree with our interpretation of *Sure-Tan.* In *A.P.R.A. Fuel,* the Second Circuit held that *Sure-Tan* bars awards of backpay only to undocumented discriminatees who were unavailable for work because they were outside the country and unable to lawfully reenter. *See* *A.P.R.A. Fuel,* 134 F.3d 50, 54–55 (2d Cir. 1997). Likewise, in *Felbro,* the Ninth Circuit stated:

> In *Sure-Tan,* the Supreme Court did not address the issue whether undocumented workers remaining at work in the United States throughout the backpay period are entitled to backpay awards. *Sure-Tan* barred from backpay only those undocumented workers who were unavailable for work in the backpay period because they were outside the United States without entry papers.

*Felbro,* 795 F.2d at 722. To be sure, in a later case also upholding an award of backpay to undocumented workers, the Ninth Circuit added a footnote speculating whether the enactment of IRCA might "change[ ] the mix of policy considerations underlying the case law which supports our conclusion that undocumented employees may recover backpay." *EEOC v. Hacienda Hotel,* 881 F.2d 1504, 1517 n. 11 (9th Cir.1989); *see also Rios v. Enterprise Ass'n Steamfitters,* 860 F.2d 1168, 1172 n. 2 (2d Cir.1988) (noting, in a footnote, the passage of IRCA, but "not decid[ing] the effect of this provision on future claims"). Yet the Ninth Circuit and its district courts have consistently reaffirmed that undocumented workers remain protected by labor and employment laws after IRCA and have continued to award them backpay. *See, e.g., NLRB v. Kolkka,* 170 F.3d 937 (9th Cir.1999); *Contreras v. Corinthian Vigor Ins. Brokerage, Inc.,* 25 F.Supp.2d 1053 (N.D.Cal.1998); *Escobar v. Baker,* 814 F.Supp. 1491, 1498 (W.D.Wash. 1993); *EEOC v. Tortilleria "La Mejor,"* 758 F.Supp. 585 (E.D.Cal.1991). Only the Seventh Circuit has interpreted *Sure-Tan* differently, though a strong dissent pointed out that the panel and the Supreme Court

> faced a significantly different scenario. In *Sure-Tan,* the aliens in question were not only undocumented, they were not in the country. They could not reenter for the purpose of taking up employment without breaking the law. This was the

Court's concern in *Sure-Tan* (and the panel's concern before it).

*Del Rey Tortilleria*, 976 F.2d at 1123–24 (Cudahy, J., dissenting).

### III

■ Hoffman argues that even if *Sure-Tan* does not bar backpay to undocumented discriminatees, IRCA does. Yet nothing in IRCA directly bars such an award. As Hoffman itself acknowledges, IRCA neither amends nor repeals the NLRA or any other labor law. IRCA's legislative history, moreover, shows that Congress did not intend the statute to limit the NLRA even indirectly. The House Judiciary Committee Report stated that no provision of IRCA should

> be used to undermine or diminish in any way labor protections in existing law, or to limit the powers of federal or state labor relations boards, labor standards agencies, or labor arbitrators to remedy unfair practices committed against undocumented employees for exercising their rights before such agencies or for engaging in activities protected by existing law. In particular, the employer sanctions provisions are not intended to limit in any way the scope of the term "employee" in Section 2(3) of the [NLRA], as amended, or of the rights and protections stated in Sections 7 and 8 of that Act.

H.R. Rep. 99–682, pt. 1, at 58 (1986), U.S. Code Cong. & Admin. News at 5649, 5662. The Judiciary Committee relied on *Sure-Tan* to support its view that continued protection of undocumented workers under the NLRA is fully consistent with IRCA's goals:

> As the Supreme Court observed in *Sure-Tan*, application of the NLRA [to undocumented workers] "helps to assure that the wages and employment conditions of lawful residents are not adversely affected by the competition of illegal alien employees who are not subject to the standard terms of employment."

*Id.* (internal citation omitted). Echoing this view, the House Education and Labor Committee Report stated that no provision of the law should

> limit the powers of State or Federal labor standards agencies such as the Occupational Safety and Health Administration, the Wage and Hour Division of the Department of Labor, the Equal Employment Opportunity Commission, *the National Labor Relations Board*, or Labor arbitrators, in conformity with existing law, to remedy unfair practices committed against undocumented employees for exercising their rights before such agencies or for engaging in activities protected by these agencies. To do otherwise would be counter-productive of our intent to limit the hiring of undocumented employees and the depressing effect on working conditions caused by their employment.

H.R.Rep. No. 99–682, pt. 2, at 8–9 (1986), U.S. Code Cong. & Admin. News at 5757, 5758 (emphasis added).

■ Absent a statutory bar to backpay for undocumented discriminatees, we turn to the alternative argument we understand Hoffman to be making: that the Board's backpay award fails to accommodate IRCA's goal of limiting the hiring of undocumented workers. Two principles guide our consideration of this issue. First, while the Board's formulation of remedies for NLRA violations merits the highest level of deference, *see ABF Freight Sys., Inc. v. NLRB*, 510 U.S. 317, 324, 114 S.Ct. 835, 127 L.Ed.2d 152 (1994), its interpretation of IRCA warrants no deference at all. *See, e.g., New York Shipping Ass'n v. Federal Maritime Comm'n*, 854 F.2d 1338, 1365 (D.C.Cir.1988) (agency interpretation of a statute it does not administer is entitled to no deference). Second, in enforcing the NLRA, the Board may not

> ignore other and equally important Congressional objectives. Frequently the entire scope of Congressional purpose calls for careful accommodation of one

statutory scheme to another, and it is not too much to demand of an administrative body that it undertake this accommodation without excessive emphasis upon its immediate task. *Southern Steamship Co. v. NLRB,* 316 U.S. 31, 47, 62 S.Ct. 886, 86 L.Ed. 1246 (1942). If a conflict requires the Board "to accommodate the policies of another statutory regime within the framework of the legislation it administers," it "must fully enforce the requirements of its own statute, but must do so, insofar as possible, in a manner that minimizes the impact of its actions on the policies of the other statute." *New York Shipping,* 854 F.2d at 1367.

> [A]n agency, faced with alternative methods of effectuating the policies of the statute it administers, (1) must engage in a careful analysis of the possible effects those alternative courses of action may have on the functioning and policies of other statutory regimes, with which a conflict is claimed; and (2) must explain why the action taken minimizes, to the extent possible, its intrusion into policies that are more properly the province of another agency or statutory regime. *Id.* at 1370.

The Board's first opportunity to consider whether and to what extent traditional NLRA remedies might require modification to account for IRCA's employer sanctions came in *A.P.R.A. Fuel. See* 320 N.L.R.B. 408. Beginning with *New York Shipping's* requirement that it "fully enforce the requirements of its own statute," 854 F.2d at 1367, the Board, citing *Sure-Tan,* explained why NLRA policy calls for backpay for undocumented discriminatees. 320 N.L.R.B. at 414. Because "undocumented aliens are extremely reluctant to complain to the employer or to any of the agencies charged with enforcing workplace standards," they make easy targets for an employer's "unprincipled effort to stave off ... union representation." *Id.* Employers resisting unions could simply fire undocumented workers who try to organize and then raise "the unlawful immigration status of their discharged employees in retaliation for protected activities"; employers might even "consider the penalties of IRCA a reasonable expense more than offset by the savings of employing undocumented workers or the perceived benefits of union avoidance." *Id.* at 415. The Board also found that denying backpay would harm the collective bargaining rights of authorized workers because "the continuous threat of replacement with powerless and desperate undocumented workers would certainly chill the American and authorized alien workers' exercise of their Section 7 rights." *Id.* at 414.

We recognize that there may be different views on the extent to which awarding backpay to undocumented discriminatees reduces employer incentives to violate the NLRA. It could be argued, for example, that employers would not likely risk criminal penalties for knowingly hiring undocumented workers simply to gain the increased leverage that would flow from reduced remedies for unfair labor practices. But even if this is true, employers who merely suspect their workers are undocumented will still have reason to test the boundaries of the NLRA. In the end, however, we need not resolve these policy questions, for it is the Board that possesses expertise in this area and it is to the Board that we owe deference. *See New York Shipping,* 854 F.2d at 1364 (holding that courts must defer to an agency "interpretation of its own organic legislation" even where there are competing statutory schemes). Indeed, the very existence of competing views reinforces the need for reliance on the Board's experience.

We have the same reaction to Hoffman's argument that the Board lacked authority to award backpay here because "none of the 'parade of horribles' " the Board identified in *A.P.R.A. Fuel*—including employer exploitation of workers' undocumented status to chill union activity—"could have

occurred in this case." In order to take advantage of undocumented workers, Hoffman claims, the employer must be aware of their undocumented status, and "[i]t is beyond dispute" the company did not "[know] that Castro was an undocumented alien" at the time of the unfair labor practice. *See* Supp. Br. for Pet'r at 14. According to the Board, however, denying undocumented workers remedies for retaliation would chill participation in union activities "regardless of whether the employer knew of the undocumented worker's immigration status." Supp. Br. for Resp. at 4. Hoffman provides no reason for believing that the Board's position on this issue represents an unreasonable interpretation of the NLRA.

Having explained its reasons for believing that NLRA policy requires remedies for undocumented discriminatees, the *A.P.R.A. Fuel* Board addressed its second *New York Shipping* obligation: the accommodation of immigration policy. It began by observing that the NLRA and IRCA share "virtually identical policy objectives with respect to the American workplace .... [W]e believe that we can best achieve this mutuality of purpose and effect by vigorously enforcing the NLRA, including providing traditional Board remedies, with respect to all employees, to the extent that such enforcement does not require or encourage unlawful conduct by either employers or individuals." *A.P.R.A. Fuel*, 320 N.L.R.B. at 411. As the Board noted, *Sure-Tan* itself recognized that preserving N.L.R.A. protection

> eliminates the distinct economic advantage and thus the incentive to employers of hiring illegal aliens in preference to American citizens or alien employees working lawfully. A reduction in the availability of jobs to undocumented aliens, the Court found, would in turn discourage many aliens from entering the United States illegally.

*Id.* at 412. Citing the legislative history of IRCA quoted above, the Board observed that a similar concern explained Congress'

insistence that the Act not "be used to undermine or diminish in any way labor protections in existing law." *Id.* at 413 (quoting H.R. Rep. 99–682, pt. 1, at 58, U.S. Code Cong. & Admin. News at 5662); *see also A.P.R.A. Fuel*, 134 F.3d at 56.

The Board then applied these NLRA and IRCA policies to formulate a remedy for the specific unfair labor practices it had found. To accomplish the NLRA's purposes, the Board ordered reinstatement with backpay. But in order to avoid conflict with IRCA's prohibition on knowingly hiring undocumented aliens, it conditioned reinstatement on the discriminatees' production of proper documents. *A.P.R.A. Fuel*, 320 N.L.R.B. at 415. It also ordered a limited period of backpay to give the discriminatees the opportunity to obtain this documentation.

In crafting a remedy for Castro, the Board relied on *A.P.R.A. Fuel*'s accommodation of NLRA and IRCA policies, adding an additional limit to the remedy to account for the fact that unlike A.P.R.A. Fuel, Hoffman had no knowledge of its employee's illegal status when it hired him. Applying its after-acquired evidence rule, the Board relieved Hoffman of its reinstatement obligation altogether and cut off backpay at the moment Castro's status was discovered. *Hoffman Plastic*, 314 N.L.R.B. at 685–86. Rather than "pay[ing] Castro for doing nothing," Dissenting Op. at 651, the NLRB backpay award compensates him for lost work "in aid of the Board's authority to restrain violations" that harm *all* workers, *see Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 220, 59 S.Ct. 206, 83 L.Ed. 126 (1938)—and even that award was limited in recognition of Castro's undocumented status. Because the Board had no need to adopt *A.P.R.A. Fuel*'s other remedy—the award of backpay while the discriminatees attempted to obtain documentation—the propriety of such an award is not before us.

Hoffman argues that the Board should have gone further and denied Castro back-

pay altogether. As it points out, IRCA criminalizes the false use of documents to obtain employment. Yet the Board has long held that employee misconduct does not completely immunize employers from their backpay obligations, even when the discriminatees would not have been hired but for their own wrongful conduct. *Cf.* Dissenting Op. at 651. In *John Cuneo*, for example, the discriminatee falsified his job application. 298 N.L.R.B. 856, 1990 WL 122500 (1990). Instead of denying backpay altogether, as the employer had urged, the Board limited backpay to the period between the illegal discharge and the moment the employer learned of the employee's falsification. In doing so, the Board applied the after-acquired evidence rule to "balance [its] responsibility to remedy the Respondent's unfair labor practice against the public interest in not condoning [the employee's] falsification of his employment application." *Id.* at 856. The Supreme Court has itself used the after-acquired evidence rule as a means of "deter[ring]" labor law violations and "compensat[ing]" discriminatees, without disregarding the "prerogatives" of employers. *See McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 362, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995).

Even where, as here, the discriminatee violates the law, the Supreme Court has refused to require the Board to deny all backpay. In *ABF Freight System v. NLRB*, 510 U.S. 317, 114 S.Ct. 835, 127 L.Ed.2d 152, the discriminatee perjured himself during the compliance proceeding—an act which, like Castro's fraudulent conduct, violated federal criminal law, *see* 18 U.S.C. § 1621, *cited in ABF Freight*, 510 U.S. at 328–29, 114 S.Ct. 835. Although declaring that "[f]alse testimony in a formal proceeding is intolerable," and that "perjury should be severely sanctioned," *id.* at 323, 114 S.Ct. 835, the Court rejected the company's argument that such behavior should preclude the employee from receiving backpay:

> [The company's] contention, though not inconsistent with our appraisal of [the employee's] misconduct, raises countervailing concerns. Most important is Congress' decision to delegate to the Board the primary responsibility for making remedial decisions that best effectuate the policies of the Act when it has substantiated an unfair labor practice.

*Id.* at 323–24, 114 S.Ct. 835. Writing separately to emphasize that the Board's failure to adopt an unclean hands policy "undermines and dishonors the courts," *id.* at 329, 114 S.Ct. 835, two concurring Justices nevertheless agreed that the Board acted within its remedial discretion. *Id.* at 326, 114 S.Ct. 835 (Kennedy, J., concurring), at 329, 114 S.Ct. 835 (Scalia, J., concurring in judgment).

Attempting to distinguish *ABF Freight*, the dissent says that unlike the perjury statute, IRCA forbade Castro "from obtaining a job." Dissenting Op. at 657 n.2. This misreads IRCA. The statute makes it unlawful for employers to knowingly hire undocumented aliens, 8 U.S.C. § 1324(a), and for undocumented aliens to knowingly use false documents to obtain jobs, 8 U.S.C. § 1324c(a)(3). IRCA does not explicitly make it unlawful for undocumented aliens to work. True, Castro could have been prosecuted for his fraud, but there was nothing illegal about his actual employment. So when the Board ordered limited backpay, it was not compensating Castro for the loss of wages IRCA prohibited him from earning. No matter how much Hoffman may deplore Castro's conduct, *ABF Freight* stands for the proposition that balancing Castro's misconduct against Hoffman's is the Board's responsibility, not ours. Had the Board ruled that Castro's behavior disqualified him from any backpay, we would have deferred to that decision as well. "Most important," said *ABF Freight*, and most important here, "is Congress' decision to delegate to the Board the primary responsibility for making remedial decisions that best effec-

tuate the policies of the Act when it has substantiated an unfair labor practice." 510 U.S. at 323–24, 114 S.Ct. 835.

Hoffman argues that the Board's accommodation of IRCA fails for another reason: the remedy gives undocumented discriminatees an incentive to remain in the country to continue accumulating backpay. It could also be argued that by making U.S. jobs more attractive, awarding backpay to undocumented discriminatees actually encourages illegal immigration. Even if this is so, of course, the Board's providing a purely compensatory remedy for unfair labor practices could not make illegal immigration more attractive than it would be if employers never committed unfair labor practices. Our job, however, is not to resolve, or as the dissent puts it, to "mediate," such issues, Dissenting Op. at 656–57. So long as the Board neither misinterprets IRCA, see New York Shipping, 854 F.2d at 1365, "ignore[s]" the statute's policies, nor places "excessive emphasis" on the NLRA, Southern Steamship, 316 U.S. at 47, 62 S.Ct. 886, we will not upset its precise accommodation of the statutory schemes.

In sum, the NLRB has fully satisfied its New York Shipping obligation. The Board crafted the limited backpay remedy to avoid conflict with IRCA and to implement its understanding of the purposes of both IRCA and the NLRA. According to the Board, the limited backpay award reduces employer incentives to prefer undocumented workers (IRCA's goal), reinforces collective bargaining rights for all workers (the NLRA's goal), and protects wages and working conditions for authorized workers (the goal of both Acts). Far from "ignor[ing] other and equally important Congressional objectives," Southern Steamship, 316 U.S. at 47, 62 S.Ct. 886, the Board, fully enforcing its own statute, carefully considered IRCA and modified its traditional backpay remedy accordingly. If, as Hoffman believes, undocumented discriminatees should receive no backpay at all, its remedy lies in Congress, not this court.

## IV

■ Hoffman's final argument requires little discussion. The company claims that "[b]y awarding undocumented aliens backpay without any consideration regarding whether these individuals can mitigate their damages, the Board treats illegal aliens more favorably than documented workers and, by doing so, the Board violates the equal protection clause of the Fifth Amendment to the United States Constitution." Brief for Pet'r at 33. Not only does Hoffman lack standing to assert equal protection rights of third parties, see, e.g., Powers v. Ohio, 499 U.S. 400, 410–16, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), but it points to no evidence that the Board applies a different mitigation standard to undocumented discriminatees. In any event, the Board found that Castro both sought and obtained interim employment, thus fulfilling his duty to mitigate. The Board subtracted Castro's interim earnings of almost $4,000 from his backpay award.

Finally, we think it worth pointing out that Hoffman itself could have mitigated its backpay liability either by making Castro a bona fide reinstatement offer—although it did offer to rehire him, the Board found the offer inadequate—or by complying promptly with the Board's reinstatement order issued before Castro's undocumented status became known. See Hoffman Plastic, 1998 WL 663933, at *2, *5. INS regulations promulgated pursuant to IRCA expressly permit reinstatement after unlawful discharge without requiring the employer to reverify the employee's documents. 8 C.F.R. § 274a.2(b)(viii)(A)(5).

## V

The petition for review is denied and the cross-application for enforcement is granted.

So ordered.

SENTELLE, Circuit Judge, dissenting, with whom HENDERSON and RANDOLPH, Circuit Judges, join, and GINSBURG, Circuit Judge, joins in part:

In May of 1988, an undocumented alien having illegally entered the United States compounded his illegality when he fraudulently used the name and birth certificate of Jose Castro to obtain employment in the production plant of Hoffman Plastic. On January 31, 1989, the company laid off a number of employees supportive of a union organizing effort, including the employee who had falsely and illegally represented himself to be Jose Castro. Thereafter, an administrative law judge, following an evidentiary hearing, found that Hoffman had engaged in unfair labor practices including the discriminatory selection of union adherents in the layoffs which included the illegal alien known as Castro.

After the disclosure of the undocumented worker's illegal status and his fraudulent use of the birth certificate, the administrative law judge recommended neither reinstatement nor backpay. *Hoffman Plastic Compounds, Inc.*, 314 N.L.R.B. 683, 1994 WL 397901 (1994). Upon review, the Board agreed with the ALJ that reinstatement of an undocumented alien was beyond its authority, but ordered backpay from the time of the discriminatory discharge until the revelation of Castro's undocumented status. *Hoffman Plastic Compounds, Inc.*, 326 N.L.R.B. 86, 1998 WL 663933 at *2–4. I would reverse the Board and restore the ALJ's recommended result.

As it would be unlawful for Hoffman to employ the illegal and pay him earned wages, it defies the logic of the Immigration Reform and Control Act of 1986 ("IRCA") that the employer could be compelled by law to pay to the illegal unearned wages which he could not lawfully earn and to which he would have no claim but for his prior successful fraud. If this were a case of first impression I would find it simple. I would hold that by no theory of law or equity could the federal government compel an employer to employ an illegal alien to do nothing and pay him for doing nothing when it could not lawfully employ him to work and pay him for working. But this is not a case of first impression. The Supreme Court has offered clear guidance which makes the case an even easier one.

**Analysis**

In *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 104 S.Ct. 2803, 81 L.Ed.2d 732 (1984), the Supreme Court reviewed a Seventh Circuit decision which had modified an NLRB order applying the National Labor Relations Act ("NLRA") to unfair labor practices committed against undocumented aliens, *see NLRB v. Sure-Tan, Inc.*, 672 F.2d 592 (7th Cir.1982). The High Court concluded that the Circuit was correct in upholding the Board's position "that undocumented aliens are 'employees' within the meaning of [29 U.S.C. § 152(3)]." *Sure-Tan*, 467 U.S. at 891, 104 S.Ct. 2803. The Court reached this conclusion based on the deference owed the Board in "defining the term 'employee,'" a task "that 'has been assigned primarily to the agency created by Congress to administer the Act.'" *Id.* at 891, 104 S.Ct. 2803 (quoting *NLRB v. Hearst Publications, Inc.*, 322 U.S. 111, 130, 64 S.Ct. 851, 88 L.Ed. 1170 (1944)); *cf. Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). That said, the Supreme Court nonetheless vacated the remedial portion of the Seventh Circuit decision, which had ordered the Board to award an irreducible minimum of six months backpay to each of the affected employees in the face of the employees' illegal entry and presence in the United States. In vacating that portion of the Seventh Circuit decision, the Supreme Court held, "[b]y directing the Board to impose a minimum backpay award without regard to the employees' actual economic losses or *legal availability for work*, the Court of Appeals plainly exceeded its limited authority under the Act." *Sure-Tan*, 467 U.S. at 904–05, 104

S.Ct. 2803 (emphasis added). Based on that italicized phrase, even if this were all the Supreme Court had held on the question, I would conclude that *Sure-Tan* counsels us to vacate the Board's decision overruling the logical result reached by the administrative law judge. But, the Supreme Court did not stop there.

The Supreme Court explicitly rejected the position taken by the NLRB and the majority in today's decision when it held, "[s]imilarly, in computing backpay, the employees must be deemed 'unavailable' for work (and the accrual of backpay therefore tolled) during any period when they were not lawfully entitled to be present and employed in the United States." *Id.* at 903, 104 S.Ct. 2803. Thus, the Supreme Court very clearly directed the appropriate response to the issue before the Board in⸱ the present case and did so directly opposite the disposition reached by the Board.

Read in context, the sentence speaks even more plainly:

> Nonetheless, as the Court of Appeals recognized, the implementation of the Board's traditional remedies at the compliance proceedings must be conditioned upon the employees' legal readmittance to the United States. In devising remedies for unfair labor practices, the Board is obliged to take into account another equally important Congressional objective—to wit, the objective of deterring unauthorized immigration that is embodied in the INA [Immigration and Nationality Act]. By conditioning the offers of reinstatement on the employees' legal reentry, a potential conflict with the INA is thus avoided. *Similarly, in computing backpay, the employees must be deemed "unavailable" for work (and the accrual of backpay therefore tolled) during any period when they were not lawfully entitled to be present and employed in the United States.*

*Id.* at 902–03, 104 S.Ct. 2803 (emphasis added) (internal quotation marks and citation omitted). The Supreme Court in a rather concise paragraph makes it plain that it is dealing with the possibility of affording a backpay remedy to illegal aliens. It further makes it plain that such a remedy is not an option when the employees are "deemed unavailable" for work and that such a period of deemed unavailability occurs "during any period when they were not lawfully entitled to be present and employed in the United States."

Thus, the Supreme Court has definitively answered the question before us. Castro was not lawfully entitled to be present and employed in the United States. "[E]mployees must be deemed 'unavailable' for work (and the accrual of backpay therefore tolled)" when they are so situated. Therefore, the award of backpay to Castro for that period must be vacated. The majority advances a complex of theories for avoiding what seems to be the plain import of the Supreme Court's language in *Sure-Tan.* It starts by asserting that "the Seventh Circuit crafted the restriction to deal with the precise problem it faced," that is, "undocumented discriminatees . . . returning to the country illegally to claim their backpay." Maj. Op. at 644. This analysis fails for two reasons. First, we are not controlled by the origin of the instructive sentence in the Seventh Circuit. The Supreme Court's context is the governing context without regard to the original coinage of the sentence. *Cf. Anderson v. City of Bessemer City,* 470 U.S. 564, 572–73, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) (explaining that a district judge's findings of fact and conclusions of law are the findings and conclusions of that court despite the fact they are drawn from the submissions of the parties). More importantly, the Supreme Court's statement and its context give no indication that it meant other than what it said: not simply that there is some sort of unique bar applicable to illegal immigrants who have left the country and might unlawfully return, but that the same bar extends to all not lawfully entitled to be

present and employed in the United States.

Expanding on its first attempt at distinction, the majority opines that when the Supreme Court "generally approve[d] [of] the Board's original course of action in this case by which it ordered the conventional remedy of reinstatement and backpay" it somehow had created other language inconsistent with the broad effect of the Court's language in the disputed sentence. Maj. Op. at 644. The majority then relies on the principle drawn from our decision in *Aka v. Washington Hospital Center*, 156 F.3d 1284, 1291 (D.C.Cir.1998) (en banc), that the Supreme "Court's every word and sentence cannot be read in a vacuum; its pronouncements must be read in light of the holding of the case and to the degree possible, so as to be consistent with the Court's apparent intent and with *other language* in the same opinion." (Emphasis supplied.) I have no quarrel with the principle; I simply do not agree that its application in this case compels the result reached by the majority. Indeed, I think it cuts to the contrary. The language from the *Sure-Tan* decision cited by the majority blesses in general terms the remedies of reinstatement and backpay. It no more compels us to uphold a backpay award to an employee not lawfully entitled to employment than it compels us to uphold illegal reinstatement of the same employee.

I suggest that the most important "other words" of the Supreme Court are those immediately preceding the sentence of contention. Those I have quoted above. That is, that "[i]n devising remedies for unfair labor practices, the Board is obliged to take into account ... the objective of deterring unauthorized immigration that is embodied in the INA." As the Supreme Court makes plain, there is no inherent conflict between the labor statute and the INA. The conflict arises only if the Board imposes remedies inconsistent with the immigration law. That is, the conflict arises not between two statutes, but between the remedial preferences of an administrative board and the higher authority of statutory enactment. In fact, in the following paragraph, the Supreme Court took care to note the "probable unavailability" of backpay "in light of the practical workings of the immigration laws." *Sure-Tan*, 467 U.S. at 904, 104 S.Ct. 2803. Following this "other language" of the Supreme Court, we should reach no other conclusion than the reversal of what the Board has done in the present case.

The majority further attempts to define the qualifying language away from its apparent meaning by extracting from a footnote the Supreme Court's observation that "the order's main deficiency" was that it "was 'develop[ed] in the total absence of any record evidence as to the circumstances of the individual employees.'" Maj. Op. at 644 (quoting *Sure-Tan*, 467 U.S. at 900 n. 9, 104 S.Ct. 2803). Far from supporting the majority's proposition, that language of the Supreme Court read in context actually supports the application of the eligibility language by its terms. In footnote 9, the Supreme Court is discussing the assertion of a dissenter that its review should be conducted deferentially, as if the Board rather than the Court of Appeals had developed the remedial order. Footnote 9 rejects that proposition as not going to the defect in the order. The language concerning the "total absence of any record evidence" is wholly consistent with the proposition that if the circumstances of an employee are that he was not lawfully eligible to be present and employed in the United States, then he does not receive a backpay recovery. Indeed, it is difficult to see what else the Supreme Court could have been referring to.

Today's majority opinion reads *Sure-Tan* as holding that the fired employees were entitled to backpay because it ordered a compliance proceeding "to determine the amount of backpay actually due." Maj. Op. at 645. This assertion misconstrues the posture of the case and the Court's holding. Prior to the Court's deci-

sion in *Sure-Tan*, nobody had offered any evidence concerning what happened to the employees after they were deported. There was no question that the employees left the United States, but there was no way to know whether they had legally returned during the appropriate backpay period. As the original NLRB opinion explained, "[T]here is no evidence in the record that they have not returned to the United States. The appropriate forum for determining issues relating to their availability for work is a compliance proceeding." *Sure-Tan, Inc.*, 234 N.L.R.B. 1187, 1187 (1978), *reh'rg denied, NLRB v. Sure-Tan, Inc.*, 677 F.2d 584 (7th Cir.1982), *aff'd in part, rev'd in part*, 467 U.S. 883, 104 S.Ct. 2803, 81 L.Ed.2d 732 (1984). Accordingly, the Supreme Court ordered that the case be remanded for the NLRB to determine "whether any of the discharged employees will be able . . . to establish at the compliance proceedings that they were lawfully available for employment during the backpay period." *Sure-Tan*, 467 U.S. at 904, 104 S.Ct. 2803. As the Court explained, "these compliance proceedings provide the appropriate forum where the Board and petitioners will be able to offer concrete evidence as to the amounts of backpay, *if any*, to which the discharged employees are individually entitled." *Id.* at 901, 104 S.Ct. 2803 (emphasis added).

The majority's interpretation is inconsistent with the *Sure-Tan* Court's instruction and holding. The Court acknowledged that the employees could be eligible for a backpay remedy, but it stressed that when computing their actual backpay awards, "the employees must be deemed 'unavailable' for work (and the accrual of backpay

therefore tolled) during any period when they were not lawfully entitled to be present and employed in the United States," a factual issue that had not been addressed. *Id.* at 903, 104 S.Ct. 2803. In other words, the *Sure-Tan* employees could be eligible for some backpay, but only if (and only for periods in which) they could prove that they were legally eligible to work in the United States.[1] Unlike in *Sure-Tan*, in Hoffman's case there is no factual question—Castro was lawfully unavailable throughout the backpay period and, thus, consistent with the Court's instruction in *Sure-Tan*, not entitled to receive any backpay.

Finally, the majority argues that "the sentence . . . form[s] no part of *Sure-Tan*'s holding . . . ." Maj. Op. at 644. I take this as being a tactful way of saying: "All right, the Supreme Court said it, but it's just *dicta*, we don't have to go by it." I find that singularly unimpressive. As we have observed in the past, "because 'carefully considered language of the Supreme Court, even if technically *dictum*, generally must be treated as authoritative,' this court cannot ignore the unmistakable import of [a Supreme Court decision's] analysis." *United States v. Oakar*, 111 F.3d 146, 153 (D.C.Cir.1997) (citations omitted). Or, as we have elsewhere stated, "Supreme Court dicta tends to have somewhat greater force—particularly when expressed so unequivocally." *Bangor Hydro–Electric Co. v. FERC*, 78 F.3d 659, 662 (D.C.Cir.1996).

In a different context, prior dissenters to an en banc decision once lamented that the majority had discarded Supreme Court language "as mere 'dicta,'" saying, "In our

---

**1.** The majority's assertion that the Supreme Court "made clear . . . that [a compliance] hearing would determine 'the period of time these particular employees might have continued working before apprehension by the INS,'" Maj. Op. at 644–45 (quoting *Sure-Tan*, 467 U.S. at 902, 104 S.Ct. 2803), is founded on a quotation uprooted from all context. The Supreme Court phrase encompassed in the majority's text comes from footnote 11 and was not in a discussion of what a future

compliance hearing would have determined, but rather a descriptive passage setting forth what had transpired before the Supreme Court's review. It was specifically offered to rebut the conclusion of dissenting Justice Brennan "that the Court of Appeals had estimated the proper minimum backpay award with a fair degree of precision." *Id.* (quoting *Sure-Tan*, 467 U.S. at 909, 104 S.Ct. 2803) (internal quotes omitted).

view it is quite presumptuous for members of an inferior court to dismiss a decision of the Supreme Court in so cavalier a manner." *Hubbard v. Administrator, EPA,* 982 F.2d 531, 540 (D.C.Cir.1992) (en banc) (Edwards, J., dissenting). Just so here. The Supreme Court has told us that "employees must be deemed unavailable for work and the accrual of backpay tolled during any period when they were not lawfully entitled to be present and employed in the United States." Indeed, this statement is more than dicta—rather, it was an unequivocal instruction for the Board to follow in its compliance proceeding on remand. I would not dismiss the Supreme Court's instruction in so cavalier a manner as does the majority.

In the end, I submit the Supreme Court has made clear the state of the law: "employees must be deemed 'unavailable' for work (and the accrual of backpay therefore tolled) during any period when they were not lawfully entitled to be present and employed in the United States." Read in context, read out of context, or read both ways and compared, the majority is left with no way of dealing with the High Court's plain statement. I invite the reader to review the phrase "not lawfully entitled to be present and employed" in its original context. I further suggest that contextual illumination for this sentence of the High Court's opinion is supplied in the Court's analysis of the Seventh Circuit decision that it was reversing. The High Court described that decision as "[r]ecognizing that the discharged employees would most likely not have been lawfully available for employment and so *would receive no backpay award at all....*" *Sure-Tan,* 467 U.S. at 890, 104 S.Ct. 2803 (emphasis added). Thus, the governing factor in determining eligibility for backpay awards is not mere presence, but also the lawful entitlement to be present and to be employed.

The majority's construction of the phrase "not lawfully entitled to be present and employed in the United States" is

tantamount to rewriting it to read "not present, and not lawfully entitled to be present, in the United States." In effect, it adds the "not present" limitation and deletes the "not lawfully entitled to be ... employed" requirement. That rewriting of *Sure-Tan* leads the majority astray.

The erroneous construction of *Sure-Tan* endorsed by the majority appears to have first occurred in *Bevles Co. v. Teamsters Local 986,* 791 F.2d 1391, 1393 (9th Cir. 1986). Before that time, even its critics believed that *Sure-Tan* meant what it said. *See Sure-Tan,* 467 U.S. at 911, 104 S.Ct. 2803 (Brennan, J., dissenting) (criticizing the majority for holding that undocumented aliens "are effectively deprived of any remedy"); *Felbro, Inc.,* 274 N.L.R.B. 1268, 1269, 1985 WL 45911 (1985) (stating that the undocumented aliens in *Felbro,* who had remained in the country, would be affected by *Sure-Tan*); *Local 512, Warehouse & Office Workers' Union v. NLRB,* 795 F.2d at 705, 725 (9th Cir.1986) (*"Felbro"*) (Beezer, J., dissenting in part); Terry A. Bethel, *Recent Labor Law Decisions of the Supreme Court,* 45 MD. L.REV. 179, 196 (1986) (*"Sure-Tan* ... deprive[s] undocumented employees of any effective remedy for unlawful discrimination...."); Lucinda M. Cardinal, Note, *Immigration Reform: Solving the "Problem" of the Illegal Alien in the American Workforce,* 7 CARDOZO L.REV. 223, 244 (1985) (*"Sure-Tan* mandates that illegal aliens do not receive the remedies granted their legal coworkers."); John W. Sagaser, Note, *Rights Without a Remedy—Illegal Aliens Under the National Labor Relations Act,* 27 B.C. L.REV. 407, 452 (1986) ("By denying a minimum backpay award, the Court in effect deprives illegal alien workers of any remedy."). In *Bevles,* the Ninth Circuit was reviewing an arbitrator's award; the issue was whether the arbitrator's decision showed a "manifest disregard of the law," and the court was not entitled to reverse simply erroneous legal conclusions. *See* 791 F.2d at 1392–93 & n. 2. In not following *Sure-Tan,* the court ignored the lawful

presence requirement and considered whether the aliens in that case were lawfully entitled to be employed. The *Bevles* court relied on the fact that—prior to the passage of IRCA—it was not a criminal act for employers to hire undocumented aliens. *See id.* at 1393. The court also considered the effect of section 2805 of the California Labor Code, which prohibited employers from knowingly employing undocumented aliens if it would affect lawful workers. Because an unreversed state court decision had previously held section 2805 unconstitutional, the court did not fault the arbitrator for disregarding it. *See id.* at 1393–94.

The focus on the lawful right to grant employment continued in *Felbro.* The Ninth Circuit there again relied on the fact that it was not illegal for an employer to hire undocumented aliens. Because the *Sure-Tan* employees could not lawfully reenter the United States, the court noted that they were "unavailable for work during the backpay period." *Felbro,* 795 F.2d at 719. The court reasoned that being illegally present in the United States did not create unavailability because "[t]here is no provision 'in the INA making it unlawful for an employer to hire an alien who is present or working in the United States without appropriate authorization.'" *Id.* (quoting *Sure-Tan,* 467 U.S. at 892–93, 104 S.Ct. 2803).

Since the passage of IRCA, both the Second and the Ninth Circuits have registered concern over IRCA's effect on their misguided attempts to limit *Sure-Tan.* In *Rios v. Enterprise Ass'n Steamfitters Local Union 638,* 860 F.2d 1168 (2d Cir. 1988), the Second Circuit was careful to explain that recovery was only permissible because the claimants were "available for employment during the entire period covered by the backpay order, since such employment would have violated no immigration law." *Id.* at 1173. The court explicitly reserved the question of whether IRCA would affect later claims. *See id.* at 1172 n. 2. The Ninth Circuit likewise has

questioned the viability of its *Felbro* decision after IRCA. *See EEOC v. Hacienda Hotel,* 881 F.2d 1504, 1517–18 n. 11 (9th Cir.1989). In a further Second Circuit case postdating the enactment of IRCA, that circuit continued to follow its pre-enactment precedent. *See NLRB v. A.P.R.A. Fuel Oil Buyers Group, Inc.,* 134 F.3d 50 (2d Cir.1997). However, as Judge Jacobs clearly demonstrated on dissent, without the slender reed of the employer's legal capacity to hire undocumented aliens, "an undocumented alien is not *'lawfully* available for employment.'" *Id.* at 62 (Jacobs, J., dissenting) (quoting *Sure-Tan,* emphasis supplied by Judge Jacobs). As Judge Jacobs pointed out, the remedy of backpay to the alien ineligible for employment "is foreclosed by *Sure-Tan* and IRCA." *Id.*

Like the Second Circuit in *A.P.R.A. Fuel,* the majority today offers nothing that should lead us to believe that the Supreme Court in *Sure-Tan* meant anything other than what it said; and what it said disqualifies the illegal alien in this case from an award of backpay.

In *Sure-Tan* the Court emphasized, "[W]e remain bound to respect the directives of the INA as well as the NLRA and to guard against judicial distortion of the statutory limits placed by Congress on the Board's remedial authority." *Sure-Tan,* 467 U.S. at 904 n. 13, 104 S.Ct. 2803. Likewise, we are bound by the statutory directives of IRCA. Those directives prohibit employers from hiring illegal aliens, *see* 8 U.S.C. § 1324a(a)(1)-(2), (e), (f), and make it a crime for illegal aliens to obtain employment using "an identification document knowing (or having reason to know) that the document was not issued lawfully for the use of the possessor, [or] . . . that the document is false," 18 U.S.C. § 1546(b); *see also* 8 U.S.C. § 1324a(b)(c)(ii) (1988). The majority opinion essentially ignores these directives, instead pointing out that "employee misconduct" and an employee's providing a "false excuse for tardiness" while under

oath, *ABF Freight Sys., Inc. v. NLRB*, 510 U.S. 317, 324, 114 S.Ct. 835, 127 L.Ed.2d 152 (1994), do not necessarily bar backpay awards. These points are inapposite—in this case, federal statutes *clearly prohibited* Castro from even obtaining a job.[2]

Instead of confronting these statutes directly, the majority chooses to mediate between statutory "goals." This Court's divination of what were the legislature's goals should never be allowed to trump what the legislature actually said. And what the legislature has said is clear. Despite what this Court's policy preferences may be, those preferences "cannot justify the judicial arrogation of remedial authority not fairly encompassed within the [NLRA]" as interpreted by the Supreme Court in *Sure-Tan*, 467 U.S. at 904, 104 S.Ct. 2803.

### Conclusion

The majority discusses at length the incentives and counter-incentives of backpay awards to illegal aliens from employers who could not legally employ them. While I do not think that law-and-economics analysis to be controlling or particularly helpful in this case, I would observe that it seems at least passing strange to think that Congress would outlaw the making of a particular type of contract between two types of individuals (United States employers and undocumented aliens) and then expect the courts to impose remedies that compel one of the parties to the disfavored contract to pay money to the other. I cannot see how those incentives could be much other than a complete wash.

For the reasons set forth above, I respectfully dissent.

GINSBURG, Circuit Judge, dissenting:

I join Judge Sentelle's dissent insofar as he demonstrates that in *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 104 S.Ct. 2803, 81

---

**2.** This distinguishes the circumstance before us from that in *ABF Freight Sys., Inc. v. NLRB*, 510 U.S. 317, 114 S.Ct. 835, 127 L.Ed.2d 152 (1994), relied upon by the major-

L.Ed.2d 732 (1984), "the Supreme Court has definitively answered the question before us." Dissent at 652. The court today simply cannot convincingly evade the High Court's clear statement that "in computing backpay, the employees must be deemed 'unavailable' for work (and the accrual of back pay therefore tolled) during any period when they were not lawfully entitled to be present and employed in the United States." 467 U.S. at 903, 104 S.Ct. 2803.

Because I believe that *Sure-Tan* is controlling, I do not think it necessary to reach the question whether the Board reasonably reconciled the remedial scheme of the NLRA with the policies embodied in the IRCA.

---

ity. *See* Maj. Op. at 649. The perjury statute provides for criminal sanctions; it does not forbid a present or potential perjurer from obtaining a job.