# HOFFMAN PLASTIC COMPOUNDS, INC. *v.* NATIONAL LABOR RELATIONS BOARD

No. 00–1595.   Argued January 15, 2002—Decided March 27, 2002

*Ryan D. McCortney* argued the cause for petitioner. With him on the briefs was *Maurice Baskin.*

*Paul R. Q. Wolfson* argued the cause for respondent. With him on the brief were *Solicitor General Olson, Deputy Solicitor General Wallace, Arthur F. Rosenfeld, John H. Ferguson, Norton J. Come,* and *John Emad Arbab.**

---

*Ann Elizabeth Reesman* and *Daniel V. Yager* filed a brief for the Equal Employment Advisory Council et al. as *amici curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the State of New York et al. by *Eliot Spitzer,* Attorney General of New York, *Caitlin J. Halligan,* Solicitor General, *Daniel Smirlock,* Deputy Solicitor General, and *M. Patricia Smith* and *Seth Kupperberg,* Assistant Attorneys General, and by the Attorneys General for their respective jurisdictions as follows: *Janet Napolitano* of Arizona, *Bill Lockyer* of California, *Earl I. Anzai* of Hawaii, *Thomas F. Reilly* of Massachusetts, *Darrell V. McGraw, Jr.,* of West Virginia, and *Anabelle Rodriguez* of Puerto Rico; for the American Civil Liberties Union Foundation et al. by *Craig Goldblatt* and *Lucas Guttentag;* for the American Federation of Labor and Congress of Industrial Organizations by *Jonathan P. Hiatt, James B. Coppess,* and *Michael Rubin;* for Employers and Employer Organizations by *David A. Schulz, Jeffrey H. Drichta,* and *Michael J. Wishnie;* and for the National Employment Law Project et al. by *Rebecca Smith, James Reif,* and *James Williams.*

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

The National Labor Relations Board (Board) awarded backpay to an undocumented alien who has never been legally authorized to work in the United States. We hold that such relief is foreclosed by federal immigration policy, as expressed by Congress in the Immigration Reform and Control Act of 1986 (IRCA).

Petitioner Hoffman Plastic Compounds, Inc. (petitioner or Hoffman), custom-formulates chemical compounds for businesses that manufacture pharmaceutical, construction, and household products. In May 1988, petitioner hired Jose Castro to operate various blending machines that "mix and cook" the particular formulas per customer order. Before being hired for this position, Castro presented documents that appeared to verify his authorization to work in the United States. In December 1988, the United Rubber, Cork, Linoleum, and Plastic Workers of America, AFL–CIO, began a union-organizing campaign at petitioner's production plant. Castro and several other employees supported the organizing campaign and distributed authorization cards to co-workers. In January 1989, Hoffman laid off Castro and other employees engaged in these organizing activities.

Three years later, in January 1992, respondent Board found that Hoffman unlawfully selected four employees, including Castro, for layoff "in order to rid itself of known union supporters" in violation of §8(a)(3) of the National Labor Relations Act (NLRA).[1] 306 N. L. R. B. 100. To remedy this violation, the Board ordered that Hoffman (1) cease and desist from further violations of the NLRA, (2) post a detailed notice to its employees regarding the remedial order, and (3) offer reinstatement and backpay to the

---

[1] Section 8(a)(3) of the NLRA prohibits discrimination "in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 49 Stat. 452, as added, 61 Stat. 140, 29 U. S. C. §158(a)(3).

four affected employees. *Id.*, at 107–108. Hoffman entered into a stipulation with the Board's General Counsel and agreed to abide by the Board's order.

In June 1993, the parties proceeded to a compliance hearing before an Administrative Law Judge (ALJ) to determine the amount of backpay owed to each discriminatee. On the final day of the hearing, Castro testified that he was born in Mexico and that he had never been legally admitted to, or authorized to work in, the United States. 314 N. L. R. B. 683, 685 (1994). He admitted gaining employment with Hoffman only after tendering a birth certificate belonging to a friend who was born in Texas. *Ibid.* He also admitted that he used this birth certificate to fraudulently obtain a California driver's license and a Social Security card, and to fraudulently obtain employment following his layoff by Hoffman. *Ibid.* Neither Castro nor the Board's General Counsel offered any evidence that Castro had applied or intended to apply for legal authorization to work in the United States. *Ibid.* Based on this testimony, the ALJ found the Board precluded from awarding Castro backpay or reinstatement as such relief would be contrary to *Sure-Tan, Inc.* v. *NLRB*, 467 U. S. 883 (1984), and in conflict with IRCA, which makes it unlawful for employers knowingly to hire undocumented workers or for employees to use fraudulent documents to establish employment eligibility. 314 N. L. R. B., at 685–686.

In September 1998, four years after the ALJ's decision, and nine years after Castro was fired, the Board reversed with respect to backpay. 326 N. L. R. B. 1060. Citing its earlier decision in *A. P. R. A. Fuel Oil Buyers Group, Inc.*, 320 N. L. R. B. 408 (1995), the Board determined that "the most effective way to accommodate and further the immigration policies embodied in [IRCA] is to provide the protections and remedies of the [NLRA] to undocumented workers in the same manner as to other employees." 326 N. L. R. B., at 1060. The Board thus found that Castro was entitled to

$66,951 of backpay, plus interest. *Id.*, at 1062. It calculated this backpay award from the date of Castro's termination to the date Hoffman first learned of Castro's undocumented status, a period of 4½ years. *Id.*, at 1061. A dissenting Board member would have affirmed the ALJ and denied Castro all backpay. *Id.*, at 1062 (opinion of Hurtgen).

Hoffman filed a petition for review of the Board's order in the Court of Appeals. A panel of the Court of Appeals denied the petition for review. 208 F. 3d 229 (CADC 2000). After rehearing the case en banc, the court again denied the petition for review and enforced the Board's order. 237 F. 3d 639 (2001). We granted certiorari, 533 U. S. 976 (2001), and now reverse.[2]

This case exemplifies the principle that the Board's discretion to select and fashion remedies for violations of the NLRA, though generally broad, see, *e. g., NLRB* v. *Seven-Up Bottling Co. of Miami, Inc.*, 344 U. S. 344, 346–347 (1953), is

---

[2] The Courts of Appeals have divided on the question whether the Board may award backpay to undocumented workers. Compare *NLRB* v. *A. P. R. A. Fuel Oil Buyers Group, Inc.*, 134 F. 3d 50, 56 (CA2 1997) (holding that illegal workers could collect backpay under the NLRA), and *Local 512, Warehouse and Office Workers' Union* v. *NLRB*, 795 F. 2d 705, 719–720 (CA9 1986) (same), with *Del Rey Tortilleria, Inc.* v. *NLRB*, 976 F. 2d 1115, 1121–1122 (CA7 1992) (holding that illegal workers could not collect backpay under the NLRA). The question has a checkered career before the Board, as well. Compare *Felbro, Inc.*, 274 N. L. R. B. 1268, 1269 (1985) (illegal workers could not be awarded backpay in light of *Sure-Tan, Inc.* v. *NLRB*, 467 U. S. 883 (1984)), with *A. P. R. A. Fuel Oil Buyers Group, Inc.*, 320 N. L. R. B. 408, 415 (1995) (illegal workers could be awarded backpay notwithstanding *Sure-Tan*); Memorandum GC 87–8 from Office of General Counsel, NLRB, The Impact of the Immigration Reform and Control Act of 1986 on Board Remedies for Undocumented Discriminatees, 1987 WL 109409 (Oct. 27, 1988) (stating Board policy that illegal workers could not be awarded backpay in light of IRCA), with Memorandum GC 98–15 from Office of General Counsel, NLRB, Reinstatement and Backpay Remedies for Discriminatees Who May Be Undocumented Aliens In Light of Recent Board and Court Precedent, 1998 WL 1806350 (Dec. 4, 1998) (stating Board policy that illegal workers could be awarded backpay notwithstanding IRCA).

not unlimited, see, *e. g., NLRB* v. *Fansteel Metallurgical Corp.,* 306 U. S. 240, 257–258 (1939); *Southern S. S. Co.* v. *NLRB,* 316 U. S. 31, 46–47 (1942); *NLRB* v. *Bildisco & Bildisco,* 465 U. S. 513, 532–534 (1984); *Sure-Tan, Inc.* v. *NLRB, supra,* at 902–904. Since the Board's inception, we have consistently set aside awards of reinstatement or backpay to employees found guilty of serious illegal conduct in connection with their employment. In *Fansteel,* the Board awarded reinstatement with backpay to employees who engaged in a "sit down strike" that led to confrontation with local law enforcement officials. We set aside the award, saying:

> "We are unable to conclude that Congress intended to compel employers to retain persons in their employ regardless of their unlawful conduct,—to invest those who go on strike with an immunity from discharge for acts of trespass or violence against the employer's property, which they would not have enjoyed had they remained at work." 306 U. S., at 255.

Though we found that the employer had committed serious violations of the NLRA, the Board had no discretion to remedy those violations by awarding reinstatement with backpay to employees who themselves had committed serious criminal acts. Two years later, in *Southern S. S. Co., supra,* the Board awarded reinstatement with backpay to five employees whose strike on shipboard had amounted to a mutiny in violation of federal law. We set aside the award, saying:

> "It is sufficient for this case to observe that the Board has not been commissioned to effectuate the policies of the Labor Relations Act so single-mindedly that it may wholly ignore other and equally important [c]ongressional objectives." 316 U. S., at 47.

Although the Board had argued that the employees' conduct did not in fact violate the federal mutiny statute, we rejected this view, finding the Board's interpretation of a statute so

far removed from its expertise merited no deference from this Court. *Id.*, at 40–46. Since *Southern S. S. Co.*, we have accordingly never deferred to the Board's remedial preferences where such preferences potentially trench upon federal statutes and policies unrelated to the NLRA. Thus, we have precluded the Board from enforcing orders found in conflict with the Bankruptcy Code, see *Bildisco, supra,* at 527–534, 529, n. 9 ("While the Board's interpretation of the NLRA should be given some deference, the proposition that the Board's interpretation of statutes outside its expertise is likewise to be deferred to is novel"), rejected claims that federal antitrust policy should defer to the NLRA, *Connell Constr. Co.* v. *Plumbers,* 421 U. S. 616, 626 (1975), and precluded the Board from selecting remedies pursuant to its own interpretation of the Interstate Commerce Act, *Carpenters* v. *NLRB,* 357 U. S. 93, 108–110 (1958).

Our decision in *Sure-Tan* followed this line of cases and set aside an award closely analogous to the award challenged here. There we confronted for the first time a potential conflict between the NLRA and federal immigration policy, as then expressed in the Immigration and Nationality Act (INA), 66 Stat. 163, as amended, 8 U. S. C. § 1101 *et seq.* Two companies had unlawfully reported alien-employees to the Immigration and Naturalization Service (INS) in retaliation for union activity. Rather than face INS sanction, the employees voluntarily departed to Mexico. The Board investigated and found the companies acted in violation of §§ 8(a)(1) and (3) of the NLRA. The Board's ensuing order directed the companies to reinstate the affected workers and pay them six months' backpay.

We affirmed the Board's determination that the NLRA applied to undocumented workers, reasoning that the immigration laws "as presently written" expressed only a " 'peripheral concern' " with the employment of illegal aliens. 467 U. S., at 892 (quoting *De Canas* v. *Bica,* 424 U. S. 351, 360 (1976)). "For whatever reason," Congress had not "made it

a separate criminal offense" for employers to hire an illegal alien, or for an illegal alien "to accept employment after entering this country illegally." *Sure-Tan*, 467 U. S., at 892–893. Therefore, we found "no reason to conclude that application of the NLRA to employment practices affecting such aliens would necessarily conflict with the terms of the INA." *Id.*, at 893.

With respect to the Board's selection of remedies, however, we found its authority limited by federal immigration policy. See *id.*, at 903 ("In devising remedies for unfair labor practices, the Board is obliged to take into account another 'equally important Congressional objective'" (quoting *Southern S. S. Co., supra*, at 47)). For example, the Board was prohibited from effectively rewarding a violation of the immigration laws by reinstating workers not authorized to reenter the United States. *Sure-Tan*, 467 U. S., at 903. Thus, to avoid "a potential conflict with the INA," the Board's reinstatement order had to be conditioned upon proof of "the employees' legal reentry." *Ibid.* "Similarly," with respect to backpay, we stated: "[T]he employees must be deemed 'unavailable' for work (and the accrual of backpay therefore tolled) during any period when they were not lawfully entitled to be present and employed in the United States." *Ibid.* "[I]n light of the practical workings of the immigration laws," such remedial limitations were appropriate even if they led to "[t]he probable unavailability of the [NLRA's] more effective remedies." *Id.*, at 904.

The Board cites our decision in *ABF Freight System, Inc.* v. *NLRB*, 510 U. S. 317 (1994), as authority for awarding backpay to employees who violate federal laws. In *ABF Freight*, we held that an employee's false testimony at a compliance proceeding did not require the Board to deny reinstatement with backpay. The question presented was "a narrow one," *id.*, at 322, limited to whether the Board was obliged to "adopt a rigid rule" that employees who testify falsely under oath automatically forfeit NLRA remedies, *id.*,

at 325. There are significant differences between that case and this. First, we expressly did not address whether the Board could award backpay to an employee who engaged in "serious misconduct" unrelated to internal Board proceedings, *id.*, at 322, n. 7, such as threatening to kill a supervisor, *ibid.* (citing *Precision Window Mfg.* v. *NLRB*, 963 F. 2d 1105, 1110 (CA8 1992)), or stealing from an employer, 510 U. S., at 322, n. 7 (citing *NLRB* v. *Commonwealth Foods, Inc.*, 506 F. 2d 1065, 1068 (CA4 1974)). Second, the challenged order did not implicate federal statutes or policies administered by other federal agencies, a "most delicate area" in which the Board must be "particularly careful in its choice of remedy." *Burlington Truck Lines, Inc.* v. *United States*, 371 U. S. 156, 172 (1962). Third, the employee misconduct at issue, though serious, was not at all analogous to misconduct that renders an underlying employment relationship illegal under explicit provisions of federal law. See, *e. g.*, 237 F. 3d, at 657, n. 2 (Sentelle, J., dissenting) ("The perjury statute provides for criminal sanctions; it does not forbid a present or potential perjurer from obtaining a job" (distinguishing *ABF Freight*)). For these reasons, we believe the present case is controlled by the *Southern S. S. Co.* line of cases, rather than by *ABF Freight*.

It is against this decisional background that we turn to the question presented here. The parties and the lower courts focus much of their attention on *Sure-Tan*, particularly its express limitation of backpay to aliens "lawfully entitled to be present and employed in the United States." 467 U. S., at 903. All agree that as a matter of plain language, this limitation forecloses the award of backpay to Castro. Castro was never lawfully entitled to be present or employed in the United States, and thus, under the plain language of *Sure-Tan*, he has no right to claim backpay. The Board takes the view, however, that read in context, this limitation applies only to aliens who left the United States and thus cannot claim backpay without lawful reentry. Brief for Re-

spondent 17–24. The Court of Appeals agreed with this view. 237 F. 3d, at 642–646. Another Court of Appeals, however, agrees with Hoffman, and concludes that *Sure-Tan* simply meant what it said, *i. e.*, that any alien who is "not lawfully entitled to be present and employed in the United States" cannot claim backpay. See *Del Rey Tortilleria, Inc.* v. *NLRB*, 976 F. 2d 1115, 1118–1121 (CA7 1992); Brief for Petitioner 7–20. We need not resolve this controversy. For whether isolated sentences from *Sure-Tan* definitively control, or count merely as persuasive dicta in support of petitioner, we think the question presented here better analyzed through a wider lens, focused as it must be on a legal landscape now significantly changed.

The *Southern S. S. Co.* line of cases established that where the Board's chosen remedy trenches upon a federal statute or policy outside the Board's competence to administer, the Board's remedy may be required to yield. Whether or not this was the situation at the time of *Sure-Tan*, it is precisely the situation today. In 1986, two years after *Sure-Tan*, Congress enacted IRCA, a comprehensive scheme prohibiting the employment of illegal aliens in the United States. § 101(a)(1), 100 Stat. 3360, 8 U. S. C. § 1324a. As we have previously noted, IRCA "forcefully" made combating the employment of illegal aliens central to "[t]he policy of immigration law." *INS* v. *National Center for Immigrants' Rights, Inc.*, 502 U. S. 183, 194, and n. 8 (1991). It did so by establishing an extensive "employment verification system," § 1324a(a)(1), designed to deny employment to aliens who (a) are not lawfully present in the United States, or (b) are not lawfully authorized to work in the United States, § 1324a(h)(3).[3] This verification system is critical to the

---

[3] For an alien to be "authorized" to work in the United States, he or she must possess "a valid social security account number card," § 1324a(b)(C)(i), or "other documentation evidencing authorization of employment in the United States which the Attorney General finds, by regulation, to be acceptable for purposes of this section," § 1324a(b)(C)(ii). See

IRCA regime. To enforce it, IRCA mandates that employ-
ers verify the identity and eligibility of all new hires by
examining specified documents before they begin work.
§ 1324a(b). If an alien applicant is unable to present the
required documentation, the unauthorized alien cannot be
hired. § 1324a(a)(1).

Similarly, if an employer unknowingly hires an unauthor-
ized alien, or if the alien becomes unauthorized while em-
ployed, the employer is compelled to discharge the worker
upon discovery of the worker's undocumented status.
§ 1324a(a)(2). Employers who violate IRCA are punished by
civil fines, § 1324a(e)(4)(A), and may be subject to criminal
prosecution, § 1324a(f)(1). IRCA also makes it a crime for
an unauthorized alien to subvert the employer verification
system by tendering fraudulent documents. § 1324c(a). It
thus prohibits aliens from using or attempting to use "any
forged, counterfeit, altered, or falsely made document" or
"any document lawfully issued to or with respect to a person
other than the possessor" for purposes of obtaining employ-
ment in the United States. §§ 1324c(a)(1)–(3). Aliens who
use or attempt to use such documents are subject to fines
and criminal prosecution. 18 U. S. C. § 1546(b). There is no
dispute that Castro's use of false documents to obtain em-
ployment with Hoffman violated these provisions.

Under the IRCA regime, it is impossible for an undocu-
mented alien to obtain employment in the United States
without some party directly contravening explicit congres-
sional policies. Either the undocumented alien tenders
fraudulent identification, which subverts the cornerstone of
IRCA's enforcement mechanism, or the employer knowingly
hires the undocumented alien in direct contradiction of its
IRCA obligations. The Board asks that we overlook this

also § 1324a(h)(3)(B) (defining "unauthorized alien" as any alien "[not] au-
thorized to be so employed by this chapter or by the Attorney General").
Regulations implementing these provisions are set forth at 8 CFR § 274a
(2001).

fact and allow it to award backpay to an illegal alien for years of work not performed, for wages that could not lawfully have been earned, and for a job obtained in the first instance by a criminal fraud. We find, however, that awarding backpay to illegal aliens runs counter to policies underlying IRCA, policies the Board has no authority to enforce or administer. Therefore, as we have consistently held in like circumstances, the award lies beyond the bounds of the Board's remedial discretion.

The Board contends that awarding limited backpay to Castro "reasonably accommodates" IRCA, because, in the Board's view, such an award is not "inconsistent" with IRCA. Brief for Respondent 29–42. The Board argues that because the backpay period was closed as of the date Hoffman learned of Castro's illegal status, Hoffman could have employed Castro during the backpay period without violating IRCA. *Id.*, at 37. The Board further argues that while IRCA criminalized the misuse of documents, "it did not make violators ineligible for back pay awards or other compensation flowing from employment secured by the misuse of such documents." *Id.*, at 38. This latter statement, of course, proves little: The mutiny statute in Southern S. S. Co., and the INA in *Sure-Tan*, were likewise understandably silent with respect to such things as backpay awards under the NLRA. What matters here, and what sinks both of the Board's claims, is that Congress has expressly made it criminally punishable for an alien to obtain employment with false documents. There is no reason to think that Congress nonetheless intended to permit backpay where but for an employer's unfair labor practices, an alien-employee would have remained in the United States illegally, and continued to work illegally, all the while successfully evading apprehension by immigration authorities.[4] Far from "accommo-

---

[4] JUSTICE BREYER contends otherwise, pointing to a single Committee Report from one House of a politically divided Congress, *post*, at 157 (dissenting opinion) (citing H. R. Rep. No. 99–682, pt. 1 (1986)), which is a

dating" IRCA, the Board's position, recognizing employer misconduct but discounting the misconduct of illegal alien employees, subverts it.

Indeed, awarding backpay in a case like this not only trivializes the immigration laws, it also condones and encourages future violations. The Board admits that had the INS detained Castro, or had Castro obeyed the law and departed to Mexico, Castro would have lost his right to backpay. See Brief for Respondent 7–8 (citing *A. P. R. A. Fuel Oil Buyers Group, Inc.*, 320 N. L. R. B., at 416). Cf. *INS* v. *National Center for Immigrants' Rights, Inc.*, 502 U. S., at 196, n. 11 ("[U]ndocumented aliens taken into custody are not entitled to work") (construing 8 CFR § 103.6(a) (1991)). Castro thus qualifies for the Board's award only by remaining inside the United States illegally. See, *e. g.*, *A. P. R. A. Fuel Buyers Group*, 134 F. 3d, at 62, n. 4 (Jacobs, J., concurring in part and dissenting in part) ("Considering that NLRB proceedings can span a whole decade, this is no small inducement to prolong illegal presence in the country"). Similarly, Castro cannot mitigate damages, a duty our cases require, see *Sure-*

---

rather slender reed, *e. g.*, *Bank One Chicago, N. A.* v. *Midwest Bank & Trust Co.*, 516 U. S. 264, 279 (1996) (SCALIA, J., concurring in part and concurring in judgment). Even assuming that a Committee Report can shed light on what Congress intended in IRCA, the Report cited by JUSTICE BREYER says nothing about the Board's authority to award backpay to illegal aliens. The Board in fact initially read the Report as stating Congress' view that such awards are foreclosed. Memorandum GC 88–9 from Office of General Counsel, NLRB, Reinstatement and Backpay Remedies for Discriminatees Who Are "Undocumented Aliens," 1988 WL 236182, *3 (Sept. 1, 1988) ("[T]he relevant committee report points out [that] *Sure-Tan* was the existing law and that decision itself limited the remedial powers of the NLRB. Clearly, Congress did not intend to overrule *Sure-Tan*"). Other courts have observed that the Report "merely endorses the first holding of *Sure-Tan* that undocumented aliens are employees within the meaning of the NLRA." *Del Rey Tortilleria, Inc.*, 976 F. 2d, at 1121 (citation omitted). Our first holding in *Sure-Tan* is not at issue here and does not bear at all on the scope of Board remedies with respect to undocumented workers.

*Tan,* 467 U. S., at 901 (citing *Seven-Up Bottling,* 344 U. S., at 346; *Phelps Dodge Corp.* v. *NLRB,* 313 U. S. 177, 198 (1941)), without triggering new IRCA violations, either by tendering false documents to employers or by finding employers willing to ignore IRCA and hire illegal workers. The Board here has failed to even consider this tension. See 326 N. L. R. B., at 1063, n. 10 (finding that Castro adequately mitigated damages through interim work with no mention of ALJ findings that Castro secured interim work with false documents).[5]

We therefore conclude that allowing the Board to award backpay to illegal aliens would unduly trench upon explicit statutory prohibitions critical to federal immigration policy, as expressed in IRCA. It would encourage the successful evasion of apprehension by immigration authorities, condone prior violations of the immigration laws, and encourage future violations. However broad the Board's discretion to

---

[5] When questioned at oral argument about the tension between affirmative mitigation duties under the NLRA and explicit prohibitions against employment of illegal aliens in IRCA, the Government candidly stated: "[T]he board has not examined this issue in detail." Tr. of Oral Arg. 32. JUSTICE BREYER says that we should nonetheless defer to the Government's view that the Board's remedy is entirely consistent with IRCA. *Post,* at 161 (dissenting opinion). But such deference would be contrary to *Southern S. S. Co.* v. *NLRB,* 316 U. S. 31, 40–46 (1942), where the Government told us that the Board's remedy was entirely consistent with the federal maritime laws, and *NLRB* v. *Bildisco & Bildisco,* 465 U. S. 513, 529–532 (1984), where the Government told us that the Board's remedy was entirely consistent with the Bankruptcy Code, and *Sure-Tan,* 467 U. S., at 892–894, 902–905, where the Government told us that the Board's remedy was entirely consistent with the INA. See also *Carpenters* v. *NLRB,* 357 U. S. 93, 108–110 (1958) (rejecting Government position that we should defer to the Board's interpretation of the Interstate Commerce Act). We did not defer to the Government's position in any of these cases, and there is even less basis for doing so here since IRCA—unlike the maritime statutes, the Bankruptcy Code, or the INA—not only speaks directly to matters of employment but expressly criminalizes the only employment relationship at issue in this case.

fashion remedies when dealing only with the NLRA, it is not so unbounded as to authorize this sort of an award.

Lack of authority to award backpay does not mean that the employer gets off scot-free. The Board here has already imposed other significant sanctions against Hoffman—sanctions Hoffman does not challenge. See *supra*, at 140. These include orders that Hoffman cease and desist its violations of the NLRA, and that it conspicuously post a notice to employees setting forth their rights under the NLRA and detailing its prior unfair practices. 306 N. L. R. B., at 100–101. Hoffman will be subject to contempt proceedings should it fail to comply with these orders. *NLRB* v. *Warren Co.*, 350 U. S. 107, 112–113 (1955) (Congress gave the Board civil contempt power to enforce compliance with the Board's orders). We have deemed such "traditional remedies" sufficient to effectuate national labor policy regardless of whether the "spur and catalyst" of backpay accompanies them. *Sure-Tan*, 467 U. S., at 904. See also *id.*, at 904, n. 13 ("This threat of contempt sanctions . . . provides a significant deterrent against future violations of the [NLRA]"). As we concluded in *Sure-Tan*, "in light of the practical workings of the immigration laws," any "perceived deficienc[y] in the NLRA's existing remedial arsenal" must be "addressed by congressional action," not the courts. *Id.*, at 904. In light of IRCA, this statement is even truer today.[6]

The judgment of the Court of Appeals is reversed.

*It is so ordered.*

---

[6] Because the Board is precluded from imposing punitive remedies, *Republic Steel Corp.* v. *NLRB*, 311 U. S. 7, 9–12 (1940), it is an open question whether awarding backpay to undocumented aliens, who have no entitlement to work in the United States at all, might constitute a prohibited punitive remedy against an employer. See *Del Rey Tortilleria, Inc.* v. *NLRB*, 976 F. 2d, at 1119 (finding that undocumented workers discharged in violation of the NLRA have not been harmed in a legal sense and should not be entitled to backpay, because the "'award provisions of the NLRA are remedial, not punitive, in nature, and thus should be awarded only to

JUSTICE BREYER, with whom JUSTICE STEVENS, JUSTICE SOUTER, and JUSTICE GINSBURG join, dissenting.

I cannot agree that the backpay award before us "runs counter to," or "trenches upon," national immigration policy. *Ante*, at 147, 149 (citing the Immigration Reform and Control Act of 1986 (IRCA)). As *all* the relevant agencies (including the Department of Justice) have told us, the National Labor Relations Board's limited backpay order will *not* interfere with the implementation of immigration policy. Rather, it reasonably helps to deter unlawful activity that *both* labor laws *and* immigration laws seek to prevent. Consequently, the order is lawful. See *ante*, at 142 (recognizing "broad" scope of Board's remedial authority).

\* \* \*

The Court does not deny that the employer in this case dismissed an employee for trying to organize a union—a crude and obvious violation of the labor laws. See 29 U. S. C. § 158(a)(3) (1994 ed.); *NLRB* v. *Transportation Management Corp.*, 462 U. S. 393, 398 (1983). And it cannot deny that the Board has especially broad discretion in choosing an appropriate remedy for addressing such violations. *NLRB* v. *Gissel Packing Co.*, 395 U. S. 575, 612, n. 32 (1969) (Board "draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts"). Nor can it deny that in such circumstances backpay awards serve critically important remedial purposes. *NLRB* v. *J. H. Rutter-Rex Mfg. Co.*, 396 U. S. 258, 263 (1969). Those purposes involve more than victim compensation; they also include deterrence, *i. e.*, discouraging

those individuals who have suffered harm'") (quoting *Local 512, Warehouse and Office Workers Union* v. *NLRB*, 795 F. 2d, at 725 (Beezer, J., dissenting in part)). Because we find the remedy foreclosed on other grounds, we do not address whether the award at issue here is "'punitive' and hence beyond the authority of the Board." *Sure-Tan, supra*, at 905, n. 14.

employers from violating the Nation's labor laws. See *ante*, at 152 (recognizing the deterrent purposes of the National Labor Relations Act (NLRA)); *Sure-Tan, Inc.* v. *NLRB*, 467 U. S. 883, 904, n. 13 (1984) (same).

Without the possibility of the deterrence that backpay provides, the Board can impose only future-oriented obligations upon law-violating employers—for it has no other weapons in its remedial arsenal. *Ante*, at 152. And in the absence of the backpay weapon, employers could conclude that they can violate the labor laws at least once with impunity. See *A. P. R. A. Fuel Oil Buyers Group, Inc.*, 320 N. L. R. B. 408, 415, n. 38 (1995) (without potential backpay order employer might simply discharge employees who show interest in a union "secure in the knowledge" that only penalties were requirements "to cease and desist and post a notice"); cf. *Golden State Bottling Co.* v. *NLRB*, 414 U. S. 168, 185 (1973); cf. also *EEOC* v. *Waffle House, Inc.*, 534 U. S. 279, 296, n. 11 (2002) (backpay award provides important incentive to report illegal employer conduct); *Albemarle Paper Co.* v. *Moody*, 422 U. S. 405, 417–418 (1975) ("It is the reasonably certain prospect of a backpay award" that leads employers to "shun practices of dubious legality"). Hence the backpay remedy is necessary; it helps make labor law enforcement credible; it makes clear that violating the labor laws will not pay.

Where in the immigration laws can the Court find a "policy" that might warrant taking from the Board this critically important remedial power? Certainly not in any statutory language. The immigration statutes say that an employer may not knowingly employ an illegal alien, that an alien may not submit false documents, and that the employer must verify documentation. See 8 U. S. C. §§ 1324a(a)(1), 1324a(b); 18 U. S. C. § 1546(b)(1). They provide specific penalties, including criminal penalties, for violations. *Ibid.;* 8 U. S. C. §§ 1324a(e)(4), 1324a(f)(1). But the statutes' language itself does not explicitly state how a violation is to effect the en-

forcement of other laws, such as the labor laws. What is to happen, for example, when an employer hires, or an alien works, in violation of these provisions? Must the alien forfeit all pay earned? .May the employer ignore the labor laws? More to the point, may the employer violate those laws with impunity, at least once—secure in the knowledge that the Board cannot assess a monetary penalty? The immigration statutes' language simply does not say.

Nor can the Court comfortably rest its conclusion upon the immigration laws' purposes. For one thing, the general purpose of the immigration statute's employment prohibition is to diminish the attractive force of employment, which like a "magnet" pulls illegal immigrants toward the United States. H. R. Rep. No. 99–682, pt. 1, p. 45 (1986). To permit the Board to award backpay could not significantly increase the strength of this magnetic force, for so speculative a future possibility could not realistically influence an individual's decision to migrate illegally. See *A. P. R. A. Fuel Oil Buyers Group, Inc., supra,* at 410–415 (no significant influence from so speculative a factor); *Patel* v. *Quality Inn South,* 846 F. 2d 700, 704 (CA11 1988) (aliens enter the country "in the hope of getting a job," not gaining "the protection of our labor laws"); *Peterson* v. *Neme,* 222 Va. 477, 482, 281 S. E. 2d 869, 872 (1981) (same); *Arteaga* v. *Literski,* 83 Wis. 2d 128, 132, 265 N. W. 2d 148, 150 (1978) (same); H. R. Rep. No. 99–682, at 45 (same).

To *deny* the Board the power to award backpay, however, might very well increase the strength of this magnetic force. That denial lowers the cost to the employer of an initial labor law violation (provided, of course, that the only victims are illegal aliens). It thereby increases the employer's incentive to find and to hire illegal-alien employees. Were the Board forbidden to assess backpay against a *knowing* employer—a circumstance not before us today, see 237 F. 3d 639, 648 (CADC 2001)—this perverse economic incentive, which runs directly contrary to the immigration statute's basic objective,

would be obvious and serious. But even if limited to cases where the employer did not know of the employee's status, the incentive may prove significant—for, as the Board has told us, the Court's rule offers employers immunity in borderline cases, thereby encouraging them to take risks, *i. e.*, to hire with a wink and a nod those potentially unlawful aliens whose unlawful employment (given the Court's views) ultimately will lower the costs of labor law violations. See Brief for Respondent 30–32; Tr. of Oral Arg. 41, 47; cf. also General Accounting Office, Garment Industry: Efforts to Address the Prevalence and Conditions of Sweatshops 8 (GAO/HEHS–95–29, Nov. 1994) (noting a higher incidence of labor violations in areas with large populations of undocumented aliens). The Court has recognized these considerations in stating that the labor laws must apply to illegal aliens in order to ensure that "there will be no advantage under the NLRA in preferring illegal aliens" and therefore there will be "fewer incentives for aliens themselves to enter." *Sure-Tan, supra,* at 893–894. The Court today accomplishes the precise opposite.

The immigration law's specific labor-law-related purposes also favor preservation, not elimination, of the Board's back-pay powers. See *A. P. R. A. Fuel Oil Buyers Group, Inc., supra,* at 414 (immigration law seeks to combat the problem of aliens' willingness to "work in substandard conditions and for starvation wages"); cf. also *Sure-Tan,* 467 U. S., at 893 ("[E]nforcement of the NLRA . . . is compatible with the policies" of the Immigration and Nationality Act). As I just mentioned and as this Court has held, the immigration law foresees application of the Nation's labor laws to protect "workers who are illegal immigrants." *Id.,* at 891–893; H. R. Rep. No. 99–682, at 58. And a policy of *applying* the labor laws must encompass a policy of *enforcing* the labor laws effectively. Otherwise, as JUSTICE KENNEDY once put the matter, "we would leave helpless the very persons who most need protection from exploitative employer practices."

*NLRB* v. *Apollo Tire Co.*, 604 F. 2d 1180, 1184 (CA9 1979) (concurring opinion). That presumably is why those in Congress who wrote the immigration statute stated explicitly and unequivocally that the immigration statute does *not* take from the Board *any* of its remedial authority. H. R. Rep. No. 99–682, at 58 (IRCA does not "undermine or diminish in any way labor protections in existing law, or . . . limit the powers of federal or state labor relations boards . . . to remedy unfair practices committed against undocumented employees").

Neither does precedent help the Court. Indeed, in *ABF Freight System, Inc.* v. *NLRB*, 510 U. S. 317 (1994), this Court *upheld* an award of backpay to an unlawfully discharged employee guilty of a serious crime, namely, perjury committed during the Board's enforcement proceedings. *Id.*, at 323. See also *id.*, at 326–331 (SCALIA, J., concurring in judgment while stressing seriousness of misconduct). The Court unanimously held that the Board retained "broad discretion" to remedy the labor law violation through a backpay award, while leaving enforcement of the criminal law to ordinary perjury-related civil and criminal penalties. See *id.*, at 325; see also 18 U. S. C. § 1621 (criminal penalties for perjury).

The Court, trying to distinguish *ABF Freight*, says that the Court there left open "whether the Board could award backpay to an employee who engaged in 'serious misconduct' unrelated to internal Board proceedings." *Ante*, at 146. But the Court does not explain why (assuming misconduct of equivalent seriousness) lack of a relationship to Board proceedings matters, nor why the Board should have to do more than take that misconduct into account—as it did here. 326 N. L. R. B. 1060, 1060–1062 (1998) (thoroughly discussing relevance of immigration policies); see also *A. P. R. A. Fuel Oil Buyers Group, Inc.*, 320 N. L. R. B., at 412–414 (same). The Court adds that the Board order in *ABF Freight* "did not implicate federal statutes or policies administered by other

federal agencies." *Ante*, at 146. But it does not explain why this matters when, as here, the Attorney General, whose Department—through the Immigration and Naturalization Service—administers the immigration statutes, *supports* the Board's order. Nor does it explain why the perjury statute at issue in *ABF Freight* was not a "statute . . . administered by" another "agenc[y]." See 510 U. S., at 329 (SCALIA, J., concurring in judgment) (noting Department of Justice officials' responsibility for prosecuting perjury).

The Court concludes that the employee misconduct at issue in *ABF Freight*, "though serious, was not at all analogous to misconduct that renders an underlying employment relationship illegal." *Ante*, at 146. But this conclusion rests upon an implicit assumption—the assumption that the immigration laws' ban on employment is not compatible with a backpay award. And that assumption, as I have tried to explain, is not justified. See *supra*, at 155–157.

At the same time, the two earlier cases upon which the Court relies, *NLRB* v. *Fansteel Metallurgical Corp.*, 306 U. S. 240 (1939), and *Southern S. S. Co.* v. *NLRB*, 316 U. S. 31, 47 (1942), offer little support for its conclusion. The Court correctly characterizes both cases as ones in which this Court set aside the Board's remedy (more specifically, reinstatement). *Ante*, at 142–144. But the Court does not focus upon the underlying circumstances—which in those cases were very different from the circumstances present here. In both earlier cases, the employer had committed an independent unfair labor practice—in the one by creating a company union, *Fansteel, supra*, at 250, in the other by refusing to recognize the employees' elected representative, *Southern S. S. Co., supra*, at 32–36, 48–49. In both cases, the employees had responded with unlawful acts of their own—a sit-in and a mutiny. *Fansteel, supra*, at 252; *Southern S. S. Co., supra*, at 48. And in both cases, the Court held that the employees' own unlawful conduct provided the employer with "good cause" for discharge, severing any con-

nection to the earlier unfair labor practice that might otherwise have justified reinstatement and backpay. *Fansteel, supra,* at 254–259; *Southern S. S. Co., supra,* at 47–49.

By way of contrast, the present case concerns a discharge that was not for "good cause." The discharge did not sever any connection with an unfair labor practice. Indeed, the discharge *was* the unfair labor practice. Hence a determination that backpay was inappropriate in the former circumstances (involving a *justifiable* discharge) tells us next to nothing about the appropriateness as a legal remedy in the latter (involving an *un*justifiable discharge), the circumstances present here.

The Court also refers to the statement in *Sure-Tan, Inc.* v. *NLRB,* 467 U. S., at 903, that "employees must be deemed 'unavailable' for work (and the accrual of backpay therefore tolled) during any period when they were not lawfully entitled to be present and employed in the United States." The Court, however, does not rely upon this statement as determining its conclusion. See *ante,* at 146–147. And it is right not to do so. See *Reiter* v. *Sonotone Corp.,* 442 U. S. 330, 341 (1979) ("[L]anguage of an opinion" must be "read in context" and not "parsed" like a statute). *Sure-Tan* involved an order reinstating (with backpay) illegal aliens who had left the country and returned to Mexico. 467 U. S., at 888–889. In order to collect the backpay to which the order entitled them, the aliens would have had to reenter the country illegally. Consequently, the order itself could not have been enforced without leading to a violation of criminal law. *Id.,* at 903. Nothing in the Court's opinion suggests that the Court intended its statement to reach to circumstances different from and not at issue in *Sure-Tan,* where an order, such as the order before us, does not require the alien to engage in further illegal behavior.

Finally, the Court cannot reasonably rely upon the award's negative features taken together. The Court summarizes those negative features when it says that the Board "asks

that we . . . award backpay to an illegal alien [1] for years of work not performed, [2] for wages that could not lawfully have been earned, and [3] for a job obtained in the first instance by a criminal fraud." *Ante,* at 148–149. The first of these features has little persuasive force, given the facts that (1) backpay ordinarily and necessarily is awarded to a discharged employee who may not find other work, and (2) the Board is able to tailor an alien's backpay award to avoid rewarding that alien for his legal inability to mitigate damages by obtaining lawful employment elsewhere. See, *e. g., Sure-Tan, supra,* at 901–902, n. 11 (basing backpay on "representative employee"); *A. P. R. A. Fuel,* 320 N. L. R. B., at 416 (providing backpay for reasonable period); 326 N. L. R. B., at 1062 (cutting off backpay when employer learned of unlawful status).

Neither can the remaining two features—unlawfully earned wages and criminal fraud—prove determinative, for they tell us only a small portion of the relevant story. After all, the same backpay award that compensates an employee in the circumstances the Court describes *also* requires an employer who has violated the labor laws to make a meaningful monetary payment. Considered from this equally important perspective, the award simply requires that employer to pay an employee whom the employer believed could lawfully have worked in the United States, (1) for years of work that he would have performed, (2) for a portion of the wages that he would have earned, and (3) for a job that the employee would have held—had that employer not unlawfully dismissed the employee for union organizing. In ignoring these latter features of the award, the Court undermines the public policies that underlie the Nation's labor laws.

Of course, the Court believes it is necessary to do so in order to vindicate what it sees as conflicting immigration law policies. I have explained why I believe the latter policies do not conflict. See *supra,* at 155–157. But even were I wrong, the law requires the Court to respect the Board's

conclusion, rather than to substitute its own independent view of the matter for that of the Board. The Board reached its conclusion after carefully considering both labor law and immigration law. 326 N. L. R. B., at 1060–1062; see *A. P. R. A. Fuel Oil Buyers Group, Inc., supra,* at 412–414. In doing so the Board has acted "with a discriminating awareness of the consequences of its action" on the immigration laws. *Burlington Truck Lines, Inc.* v. *United States,* 371 U. S. 156, 174 (1962). The Attorney General, charged with immigration law enforcement, has told us that the Board is right. See 8 U. S. C. § 1324a(e) (Immigration and Naturalization Service placed within the Department of Justice, under authority of Attorney General who is charged with responsibility for immigration law enforcement); cf. *United States* v. *Mead Corp.,* 533 U. S. 218, 258–259, n. 6 (2001) (SCALIA, J., dissenting) (Solicitor General's statements represent agency's position); *Jean* v. *Nelson,* 472 U. S. 846, 856, and n. 3 (1985) (agency's position with respect to its regulation during litigation "arrives with some authority"). And the Board's position is, at the least, a reasonable one. Consequently, it is lawful. *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U. S. 837, 842–843 (1984) (requiring courts to uphold reasonable agency position).

For these reasons, I respectfully dissent.