Jerome Tracy Formal Opinion Counsel No. 2003-F3 N.Y.S. Department of Labor Governor W. Averell Harriman State Office Building Albany, New York 12240
Dear Mr. Tracy:
You have requested an opinion regarding the effect of the Supreme Court's holding in Hoffman Plastic Compounds, Inc. v. National Labor RelationsBoard, 535 U.S. 137 (2002), on enforcement by the New York State Department of Labor ("Department") of its wage payment laws on behalf of undocumented immigrants. We believe that Hoffman does not preclude enforcement of State wage payment laws on behalf of undocumented immigrants.
I. Hoffman
A. Background
In 1984, the Supreme Court decided Sure-Tan, Inc. v. NLRB, 467 U.S. 883
(1984), a case in which an employer, retaliating against employees who had engaged in union-organizing efforts, reported to the Immigration and Naturalization Service (INS) the presence of several such employees who were undocumented aliens. Id. at 887. The INS investigated and, as a result of the investigation, five employees agreed to leave the country rather than face deportation. Id. Affirming the National Labor Relations Board (NLRB)'s administrative remedial orders, the Seventh Circuit concluded that the employer had violated the National Labor Relations Act (NLRA) by calling the INS and that the NLRB's usual remedies of reinstatement and backpay for violations of the NLRA were appropriate.Id. at 889. The court determined, however, that the reinstatement offer should remain open for four years to provide the former employees an adequate opportunity to legally return to the United States. Id. at 889-90. The court, "recognizing that the discharged employees would most likely not have been lawfully available for employment and so would [otherwise] receive no backpay award at all," also awarded the employees six months' worth of backpay as the minimum amount the employer would have to pay. Id.
Reviewing this decision, the Supreme Court decided that undocumented aliens were included within the definition of "employee" for purposes of the NLRA and that the application of the NLRA to undocumented aliens was consistent with the mandate of the Immigration and Nationality Act,8 U.S.C. § 1101 et seq. Id. at 891-92. The Court concluded, however, that in computing the backpay due to undocumented immigrants who left their positions of employment because of unfair labor practices, the employees would not be eligible for backpay for any time when they were not lawfully entitled to be present, and thus employed, in the United States, id. at 903, and that the other remedies imposed by the Seventh Circuit were similarly outside the court's authority to impose. Id. at 905.
At the time of the Sure-Tan decision, the Immigration and Nationality Act did not make illegal the hiring of an undocumented alien or the acceptance of employment by such an immigrant. See Sure-Tan,467 U.S. at 892-93. Subsequent to Sure-Tan, Congress amended the INA by enacting the Immigration Reform and Control Act. Pub.L. No. 99-603, 100 Stat. 3359
(1986). Under IRCA, "it is impossible for an undocumented alien to obtain employment in the United States without [either the employer or the employee] directly contravening explicit congressional policies."Hoffman, 535 U.S. at 148.
B. The Supreme Court's Decision in Hoffman
The narrow question presented in Hoffman was whether the NLRB was authorized to award backpay for violations of the NLRA to Castro, an undocumented immigrant who was illegally terminated from his employment. When applying for work at Hoffman in 1988, Castro produced a birth certificate to establish that he could legally be employed. Hoffman,535 U.S. at 141. Several months after he was hired, he engaged in activities supportive of union-organizing efforts. Id. at 140. He was subsequently terminated. Id. In 1992, the NLRB found that Hoffman, the employer, had fired him in violation of the NLRA and awarded him backpay. Id. at 140-41.
In 1993, Hoffman and the NLRB appeared before an administrative law judge to determine the amount of backpay due to the employee. 535 U.S. at 141. During the course of the hearing, Castro admitted that the birth certificate he had presented to Hoffman to verify his authorization to work in the United States was not his, that he had used this birth certificate to obtain a driver's license and a Social Security card, and that he had used these documents to gain employment after being fired by Hoffman. Id. As a result of this testimony, the ALJ concluded that Castro was not entitled to an award of backpay because such an award would violate IRCA and contravene the Supreme Court's holding in Sure-Tan. Id.
In 1998, the NLRB overruled the ALJ, determining that "the most effective way to further the immigration policies embodied in IRCA was to provide the protection of the NLRA to undocumented employees in the same manner as to legally-employed workers." Hoffman, 535 U.S. at 141-42 (citation omitted). The NLRB awarded Castro backpay for the period of time between the date of his termination and the date Hoffman first discovered that he was an undocumented alien. Id. Hoffman filed a petition for review in the District of Columbia Circuit Court of Appeals, which was denied. Id. at 142. The Supreme Court then granted certiorari. Id.
The parties in Hoffman disputed the extent to which specific language inSure-Tan[1] limited the NLRB's ability to award backpay to Castro. See535 U.S. at 146. The Court, in response to this, stated, "We need not resolve this controversy. . . . [W]e think the question presented here better analyzed through a wider lens, focused as it must be on a legal landscape now significantly changed." Id. at 147. In a 5-4 decision, the Court determined that the NLRB was not authorized to award backpay to Castro because "such relief is foreclosed by federal immigration policy, as expressed by Congress in the [IRCA]." Id. at 140. The Court concluded that it could not "overlook" IRCA's prohibition on the employment of undocumented immigrants to allow the Board "to award backpay to an illegal alien for years of work not performed, for wages that could not lawfully have been earned, and for a job obtained in the first instance by a criminal fraud." Id. at 148-49.
II. Analysis
You ask whether the decision in Hoffman that the NLRB cannot award backpay to an undocumented immigrant constrains the Department's enforcement of New York's wage payment laws on behalf of such immigrants. Because enforcement of New York's wage laws does not implicate the concerns articulated by the Court in Hoffman, we believe that Hoffman does not preclude these enforcement efforts.
A. New York State's Wage Payment Laws
The payment of wages to employees is governed by several articles of the State Labor Law. See Labor Law Articles 6 (payment of wages), 19 (minimum wage standards), and 19-A (minimum wage standards for farm workers) (collectively, "wage payment laws").
Article 6 prescribes certain duties an employer has to its employees regarding the payment of wages (e.g., frequency of payments (Labor Law § 191), form of payment (id. § 192), deductions from wages prohibited (id. § 193)). Labor Law §§ 190-199-c. Failure of an employer to pay the wages as statutorily required constitutes a misdemeanor for the first offense and a felony for the second offense.Id. § 198-a. The Commissioner of Labor ("Commissioner") is authorized to "investigate and attempt to adjust equitably controversies between employers and employees" relating to the payment of wages, to take assignment of claims for wages on behalf of employees and sue employers on such assigned wage claims, and to institute proceedings for any criminal violation of the provisions of Article 6. Id. § 196(1)(a)-(c). The statute directs the Commissioner to recover from an employer who fails to pay the wages of his employees a $500 fine for each failure. Id. § 197.
Articles 19 and 19-A of the Labor Law relate to the payment of a minimum wage. Under these articles, the Commissioner is authorized to investigate employers to determine whether State laws pertaining to payment of minimum wages are being followed. Labor Law §§ 660, 678. Failure to pay at least the minimum wage constitutes a misdemeanor. Id. §§ 662(2), 680(2). Either an employee or the Commissioner on behalf of an employee may bring a civil action against an employer to recover the amount of underpayment. Id. §§ 663, 681. Willful violation of the minimum wage laws subjects an employer to liquidated damages equal to 25% of the wages underpaid by the employer. Id.
In addition to the enumerated enforcement powers under Articles 6, 19, and 19-A, the Commissioner has general investigation and enforcement authority. Labor Law § 21. More specifically, he is granted the power to "investigate the condition of aliens relative to their employment in industry." Labor Law § 21(10). Additionally, an employee may file with the Commissioner a complaint regarding a violation of the wage payment laws for an investigation of the complaint and a statement setting the appropriate remedy. Labor Law § 196-a.
B. Impact of Hoffman
We understand from your letter that, prior to Hoffman, the Department took the position that it was authorized to enforce State wage payment laws on behalf of undocumented workers. New York's wage payment laws have indeed been held to be enforceable by an immigrant not authorized to work in the United States. Nizamuddowlah v. Bengal Cabaret, Inc., 69 A.D.2d 875
(2d Dep't 1979) (undocumented employee entitled to payment under State minimum wage law for time worked but not paid).[2] Cf. Sure-Tan, Inc.v. NLRB, 467 U.S. 883 (1984) (undocumented immigrants are "employees" under NLRA; holding not questioned in Hoffman, see 535 U.S. at 149 n. 4); Patel v. Quality Inn South, 846 F.2d 700 (11th Cir. 1988), cert.denied, 489 U.S. 1011 (1989) (undocumented aliens are "employees" entitled to protections of Fair Labor Standards Act). For the reasons discussed below, we believe that the Commissioner may continue, afterHoffman, to enforce New York's wage payment laws on behalf of undocumented immigrants.
While Hoffman interpreted the federal NLRA as not authorizing a backpay remedy for undocumented workers in light of the policies underlying IRCA, it does not address the relationship between these policies and those underlying State wage or other labor laws. We believe that the holding in Hoffman does not require the conclusion that enforcement of New York's wage payment laws is similarly foreclosed.
Hoffman is inapposite to the wage law enforcement actions that are the subject of your inquiry primarily because a backpay award to an undocumented worker for work that was not actually performed is fundamentally different from an award mandating payment of wages for work that the undocumented worker has already performed for the employer. The State's wage payment laws protect the latter. Hoffman's holding relates only to the former: in Hoffman, the Court was faced with an employee who had been unlawfully terminated and subsequently awarded backpay for the period of time between his termination and his employer's discovery that he was not authorized to work in the United States. Backpay, therefore, was a remedial award for work that the employee did not, in fact, perform, and Hoffman emphasized this point in formulating the issue before it. See 535 U.S. at 148-149 (addressing the question whether "[t]he Board [may] . . . award backpay to an illegal alien for years of work notperformed, for wages that could not lawfully have been earned, and for a job obtained in the first instance by a criminal fraud") (emphasis added).
Nothing in Hoffman suggests that IRCA mandates that undocumented workers forfeit payments for work that they have already performed or that, by hiring undocumented workers, employers may evade their legal obligation to make wage payments for work that has actually been performed. Nor does IRCA itself indicate that such a result is intended. In the absence of some indication that IRCA divests undocumented workers of any entitlement to unpaid wages for work already performed, reading Hoffman to preclude enforcement actions for such wages seems to us unwarranted.
Each federal court to have considered the question has recognized the fundamental distinction between backpay for work not performed and an award of wages for work actually performed, and based on this distinction, has concluded that the holding in Hoffman does not apply to cases arising under the Fair Labor Standards Act — federal labor legislation that provides, as do the New York wage payment laws, for recovery of unpaid wages for work performed.[3] See Flores v. Amigon,233 F. Supp.2d 462 (E.D.N.Y. 2002) (Hoffman did not deal with situation in which employees had already performed work for which unpaid wages were being sought; policy issues addressed and implicated by Hoffman do not apply with same force in such a case; and, unlike in Hoffman, where employee could not mitigate damages by seeking new employment because he could not legally be employed in the United States, in such a case, employees have "no such impediment" to receiving payment for work already performed); Flores v. Albertsons, Inc., 2002 U.S. Dist. LEXIS 6171 (C.D.Cal. Apr. 9, 2002) (Hoffman did not hold that an undocumented employee was barred from recovering unpaid wages for work actually performed; it does not establish that an award of unpaid wages to undocumented workers for work performed runs counter to IRCA and does not apply in a case where employees have not been terminated and do not seek backpay for work not performed); Singh v. Jutla C.D. R Oil, Inc., 214 F. Supp.2d 1056 (N.D.Cal. 2002) (Hoffman does not preclude an undocumented worker from seeking all forms of relief but rather "precludes illegal aliens from [the] very specific remedy" of backpay for work not performed; allowing undocumented workers to bring claim under FLSA is consistent with immigration policies underlying IRCA); Cortez v.Medina's Landscaping, 2002 U.S. Dist. LEXIS 18831 (N.D.Ill. Sept. 30, 2002) (Hoffman does not apply where undocumented alien seeks unpaid wages for work actually performed); see also Liu v. Donna Karan Int'l, Inc.,207 F. Supp.2d 191 (S.D.N.Y. 2002) (plaintiff-employees seeking unpaid wages and overtime claimed that defendant-employer violated FLSA; court concluded that employer's motion requesting discovery relating to employees' immigration status was not clearly controlled by Hoffman where employees were not seeking post-termination backpay for work not performed).
Federal agencies responsible for administering federal labor laws have also reached the same conclusion. See Employment Standards Administration Wage and Hour Division, U.S. Dep't of Labor, Fact Sheet #48, Applicationof U.S. Labor Laws to Immigrant Workers: Effect of Hoffman PlasticsDecision on Laws Enforced by the Wage and Hour Division (n.d.), available at http://www.dol.gov/esa/regs/compliance/whd/whdfs48.htm; Office of General Counsel, NLRB, GC 02-06, Procedures and Remedies forDiscriminatees Who May Be Undocumented Aliens after Hoffman PlasticCompounds, Inc. (July 19, 2002).
We agree with these courts that the distinction between backpay and payment for work performed is valid, and thus, that Hoffman should not be read to bar state enforcement actions for wages for work actually performed. We also take note of a further point expressed in these opinions. Federal courts have explained that the policies underlying IRCA would be furthered, not undermined, by payment of wages earned but not paid to undocumented immigrants. As explained by the district court inFlores v. Amigon, supra:
 [T]he policy issues addressed and implicated by the decision in Hoffman do not apply with the same force as in a case such as this. Indeed, it is arguable that enforcing the FLSA's provisions requiring employers to pay proper wages to undocumented aliens when the work has been performed actually furthers the goal of the IRCA, which requires the employer to discharge any worker upon discovery of the worker's undocumented alien status. . . . If employers know that they will not only be subject to civil penalties . . . and criminal prosecution . . . when they hire illegal aliens, but they will also be required to pay them at the same rates as legal workers for work actually performed, there are virtually no incentives left for an employer to hire an undocumented alien in the first instance.
233 F. Supp.2d at 464; see also Singh v. Jutla C.D. R Oil,Inc., 214 F. Supp.2d 1056, 1061-62 (N.D.Cal. 2002). We believe that the same argument supports enforcement of New York's wage payment laws on behalf of unauthorized aliens.
We further note that, in Hoffman, the Court expressed concern that the NLRB's remedial scheme "not only trivializes the immigration laws, it also condones and encourages future violations," by conditioning backpay on the undocumented worker's mitigation of damages, i.e., the undocumented worker's affirmative effort to secure interim employment through further violations of IRCA. Id. at 150-51. This concern simply is not present when the employee is seeking payment for work already performed. See Flores v. Albertsons, Inc., 2002 U.S. Dist. LEXIS 6171, *18-*19 (C.D.Cal., April 9, 2002); Flores v. Amigon, 233 F. Supp.2d 462,464 (E.D.N.Y. 2002).
Nor does Hoffman suggest that the State's authority to enforce its wage payment laws on behalf of undocumented workers is expressly or implicitly preempted by IRCA. Hoffman did not hold that IRCA makes unlawful any payment of back wages to undocumented aliens; rather, it construed the NLRB's remedial authority in light of the "policies underlying IRCA."535 U.S. at 149. That the Supreme Court accommodated two federal statutes in this manner does not mean that states are barred from enforcing their own laws. Indeed, an interpretation of IRCA that foreclosed enforcement of state wage laws would raise federalism concerns that were not present inHoffman. Cf. Hines v. Davidowitz, 312 U.S. 52, 67 (1941) (state law conflicts with, and thus is preempted by, federal law when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.").
We believe that Hoffman does not prevent the Department from enforcing the State's wage payment laws on behalf of illegal immigrants where "no federal statute is at issue, nor is there any federal Constitutional issue in dispute." Balbuena v. IDR Realty, LLC, N.Y. L.J., May 28, 2003, at 18 (Sup.Ct. N.Y. County May 16, 2003) (Hoffman does not inhibit State court's ability to award lost wages to an illegal immigrant in tort action brought under State common law); see also Cano v. Mallory Mgmt.,195 Misc.2d 666 (Sup.Ct. Richmond County 2003) (holding under federal law in Hoffman does not bar illegal immigrants from using New York State court system to "seek civil redress from alleged tortious conduct").
Finally, inasmuch as Hoffman was concerned with the award of backpay for "wages that could not lawfully have been earned," 535 U.S. at 149, its holding does not, in our opinion, preclude the award of non-wage monetary payments available pursuant to New York's wage payment laws. See Labor Law §§ 197 (imposing fine as civil penalty), 198 (allowing imposition of costs, attorney's fees, and liquidated damages), 198-a (imposing fine as criminal penalty), 662 (same), 663 (allowing imposition of costs, attorney's fees, and liquidated damages), 681 (same); see also Singh v.Jutla C.D. R. Oil, Inc., 214 F. Supp.2d 1056, 1060-61
(Hoffman applied only to backpay, not to "other forms of relief" such as compensatory and punitive damages).
We therefore are of the opinion that the Hoffman decision should not be read to preclude the State from enforcing its wage payment laws on behalf of undocumented workers to obtain payment for work actually performed.
Very truly yours,
ELIOT SPITZER, Attorney General
[1] The debated language was the following: "[I]n computing backpay, the employees must be deemed `unavailable' for work (and the accrual of backpay therefore tolled) during any period when they were not lawfully entitled to be present and employed in the United States."467 U.S. at 903.
[2] In Nizamuddowlah, the court's conclusion that the employee's status as an undocumented alien did not preclude recovery under the Minimum Wage Act was in part based on the fact that the definition of "employee" in that statute did not exclude aliens. 69 A.D.2d 875 (2d Dep't 1979). Similarly, the definitions of "employee" in Articles 6 and 19-A are not based on an individual's immigration status. See Labor Law §§190(2), 671(2); cf. Sure-Tan, Inc. v. NLRB, 467 U.S. 883, 892 (1984) ("Since undocumented aliens are not among the few groups of workers expressly exempted by Congress [under the NLRA], they plainly come within the broad statutory definition of `employee.'"); Patel v. Quality InnSouth, 846 F.2d 700, 702 ("Th[e] definitional framework [under the Fair Labor Standards Act] — a broad general definition followed by several specific exceptions — strongly suggests that Congress intended an all encompassing definition of the term `employee' that would include all workers not specifically excepted.").
[3] The Fair Labor Standards Act and New York's wage payment laws are statutes prescribing minimum standards for the conditions under which employees employed in certain areas work, as opposed to the NLRA, a statute concerned with protecting the ability of employees to organize and bargain collectively. See 29 U.S.C. § 151.